# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| [UNDER SEAL], | Case No: |
| Plaintiffs, | **COMPLAINT** |
| v. | |
| [UNDER SEAL], | **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| Defendants. | |

**DOCUMENT TO BE KEPT UNDER SEAL**

**DO NOT ENTER INTO PACER**

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| UNITED STATES and the STATE of TEXAS, *ex rel*. KENT VAUGHN,<br><br>        Plaintiffs,<br><br>     v.<br><br>HARRIS COUNTY HOSPITAL DISTRICT d/b/a HARRIS HEALTH SYSTEM; BEN TAUB HOSPITAL; LYNDON B. JOHNSON HOSPITAL; QUENTIN MEASE COMMUNITY HOSPITAL; HARRIS COUNTY CLINICAL SERVICES, INC.; MEMORIAL HERMANN HEALTH SYSTEM; CHRISTUS HEALTH; CHRISTUS HEALTH GULF COAST; HCA HEALTHCARE.; HCA GULF COAST DIVISION INC.; ST. JOSEPH MEDICAL CENTER, HOUSTON METHODIST; TEXAS CHILDREN'S HOSPITAL; ST. LUKE'S EPISCOPAL HEALTH SYSTEM; AFFILIATED MEDICAL SERVICES; BAYLOR COLLEGE OF MEDICINE; BAYLORMEDCARE; and UT PHYSICIANS,<br><br>        Defendants. | Case No:<br><br><br>**COMPLAINT**<br><br>**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br><br>**JURY TRIAL DEMANDED** |

## I.    SUMMARY OF CLAIMS

    1.    Pursuant to the *qui tam* provisions of the federal False Claims Act and the Texas Medicaid Fraud Prevention Act, Plaintiff-Relator Kent Vaughn, through his attorneys, on behalf of the United States of America (the "United States") and the State of Texas ("Texas"), brings this Complaint against three types of Houston-based Defendants that have been defrauding Texas Medicaid's indigent and uninsured care program: private hospitals ("Defendant private

hospitals"), public hospitals ("Defendant public hospitals"), and two medical schools and/or their affiliated entities ("Defendant medical schools").  More specifically, this action is brought to recover treble damages and civil penalties on behalf of the United States and Texas arising from false and/or fraudulent claims, statements, and records made and caused to be made by the Defendants in furtherance of their jointly-planned conspiracy to defraud that program.

2.      For at least the past ten years, all the Defendants named in this action have engaged in a complicated multi-step conspiracy to obtain excessive federal Medicaid matching funds and spend a substantial portion of those funds for improper purposes.  Defendants' scheme causes federal funds intended for under-compensated and uncompensated indigent and uninsured care to be drawn down and spent without the Congressionally-required contribution of State and/or local government matching funds.  Additionally, Defendants secretly divert Medicaid funds intended for indigent and uninsured patient care to pay for medical school costs that are outside the scope of the program the funds at issue are intended by the United States and Texas to subsidize.

3.      Defendants' scheme involves a three-way trade of cash and services between Houston-based medical schools,[1] the public hospitals, and the private hospitals.  Under an arrangement known as the Harris Collaborative Program, the medical schools provide physician and other provider services to the Defendant public hospitals without direct charge to those hospitals.  Instead, the medical schools charge the Defendant *private* hospitals for those services at a substantially inflated cost.  The private hospitals agree to pay under this usurious arrangement for one reason: in exchange for making that investment, the private hospitals collect an even greater sum of money in return, in the form on enhanced Texas Medicaid Disproportionate Share Hospitals ("DSH") and/or Uncompensated Care Pool ("UC Pool") payments for undercompensated and completely uncompensated care rendered to indigent and/or

---

[1] These include defendants Baylor College of Medicine and its physician practice group BaylorMedCare, non-party entity UT Health Science Center-Houston ("UTHealth"), and its physician practice group, defendant UT Physicians.

wholly uninsured patients.  This is possible because, under the arrangement hospitals and medical schools have entered, the public hospitals use the cost savings they realize from not paying for medical staff services to fund "intergovernmental transfers" to the State of Texas to pay the non-federal share of supplemental Medicaid DSH and/or UC Pool payments to be made to the Defendant private hospitals.

4.      Unaware of the quid pro quo nature of the financial transactions occurring between the parties to Harris Collaborative Program, Texas then uses the intragovernmental transfers supplied by Defendant public hospitals for the benefit of Defendant *private* hospitals to obtain and match increased federal Medicaid funding for under-compensated and/or wholly uncompensated care provided by the private hospitals.  The end result is that all of the defendants come out financially even or ahead, while the federal government ends up bilked for increased Medicaid expenditures that are not properly matched by proportionate State or local government investment.  Additionally, the State and federal interest in optimizing reimbursement of otherwise uncompensated indigent and uninsured care is subverted, because money intended to compensate hospitals for uncompensated care they have provided is diverted in substantial part to pay the medical schools inflated costs for physician services.

5.      The conspiring hospitals and medical schools cover up this quid pro quo arrangement because it violates applicable federal and Texas law.  Rather than representing a bona fide investment of public resources that qualify as non-federal matching funds, the public hospitals' intergovernmental transfer of funds to the State of Texas represents an illicit trade that evades required cost-sharing between Texas, the local governments, and United States.

6.      Thus, in fact, no bona fide, untainted intergovernmental transfers exist: the medical schools are not truly "donating" services to the public hospitals.  They are simply being paid by the private hospitals through federal Medicaid funds obtained by the inflated intergovernmental transfers made by the public hospitals.

7.      While this Medicaid program *requires* a combined investment of State and/or local governments and the United States to fund uncompensated indigent and uninsured care, the

end result has been that, in violation of federal law, *only* the United States is actually committing additional new funding to pay to this group of private hospitals through the Texas supplemental payments program.

8.      Moreover, over time, the increasingly one-sided lion's share of such additional federal funding for the private hospitals has been diverted away from its intended purpose of supporting indigent and uninsured care provided by those hospitals to instead supporting physician and other provider salaries and benefit expenses of faculty and staff of the medical schools.  As a result, both Texas and the United States are unknowingly having funds intended to compensate private hospitals for providing indigent and uninsured care being secretly redirected into subsidies for the medical schools and their physician faculties.

9.      Finally, because Defendants' arrangement untethers indigent and uninsured care funding requests and payments for the private hospitals from the actual and reasonable cost of providing such indigent and uninsured care, local government entities that fund the non-federal share of such expenditures have no economic incentive to oversee whether the ever-increasing total combined federal and non-federal indigent and uninsured care funding being sought each year would, in fact, be warranted by the actual needs of the program, had such funding not been diverted away from that function.  Moreover, the medical schools likewise have little incentive to provide care cost-effectively, resulting in wasteful over-spending of program-generated funds on excessive medical school charges for costs of services that should be more thoroughly pursued from private payors (and therefore not included as "uncompensated" care that Medicaid would be asked to cover).

10.      Defendants in this action include the following categories of co-conspirators:

a.   "Defendant public hospitals" (or "public hospitals") – Harris County Hospital District ("HCHD"), d/b/a Harris Health System ("HHS") (which will be referred to as "HCHD/HHS"), and its three subsidiary hospitals: Ben Taub Hospital, Lyndon B. Johnson Hospital, and Quentin Mease Hospital;

b.   "Defendant private hospitals" (or "private hospitals") – Harris County Clinical

Services, Inc. ("HCCS"), and its affiliated hospital providers: Memorial Hermann

Health System, Christus Health, Christus Health Gulf Coast, HCA Healthcare

(formerly HCA Holdings, Inc. d/b/a HCA Health Services of Texas), HCA Gulf

Coast Division Inc., St. Joseph Medical Center, Houston Methodist, Texas Children's

Hospital, and St. Luke's Episcopal Health System; and

c.   "Defendant medical schools" – Affiliated Medical Services ("AMS"), a

"coordinating entity" one of whose co-owners and members is Baylor College of

Medicine ("BCM"), BCM, and its physician practice group, BaylorMedCare.  In

addition, UT Physicians—the practice group of UT Health Science Center-Houston,

the latter of which is the other member of AMS—is the other Defendant in this group.

11.     Additionally, UT Health Science Center-Houston ("UTHealth") is involved in and

benefits from the conspiracy alleged herein.  As mentioned above, UTHealth is the other medical

school that is an owner and member of AMS.  However, as a State entity, UTHealth cannot be a

named defendant in a *qui tam* claim brought under the United States or Texas False Claims Acts

(UT Physicians, however, is not a state entity).  Nonetheless, under conspiracy law, the

Defendants that are named in this action remain jointly and severally liable for the wrongful

conduct of all participants in the conspiracy, including non-party co-conspirator UTHealth.

12.     In support of his claims as summarized above, Relator therefore alleges, based

upon personal knowledge, relevant documents, and information and belief, as follows:

## II.   <u>INTRODUCTION</u>

13.     This is an action to recover damages and civil penalties on behalf of the United

States of America and the State of Texas for Defendants' violations of the federal False Claims

Act, 31 U.S.C. §§ 3729 - 3733 (the "FCA") and the Texas Medicaid Fraud Prevention Act, Tex.

Hum. Res. Code Ann. §§ 36.001, *et seq.*

14.     This case involves Defendants' pursuit of Medicaid payments from the Federal Government through improper manipulation of the Medicaid Supplemental Payment programs. Defendants fraudulently arranged and conspired to make improper, non-bona fide donations of physician and other provider services to the Harris County Hospital District.

15.     The private hospitals paid the medical schools to deliver these provider services to the public hospitals.  In exchange, and using the cost savings it generated by not having to pay its physicians or other medical providers, HCHD/HHS made large intergovernmental transfers ("IGTs") to the Texas Medicaid program that it would have otherwise been unable to make, in order to maximize federal and state Medicaid payments to the private hospitals.  In return for "donating" physician and other provider services to the public hospitals, the private hospitals received supplemental Medicaid payments that exceeded the cost of their donations, thus making the "donation" profitable.

16.     This exchange constituted a prohibited hold harmless practice, because without the increased money freed up by the private hospitals' "donations" for the benefit of HCHD/HHS and its affiliated public hospitals, HCHD/HHS would not have transferred the amount that it did to the Texas Medicaid program, and the Centers for Medicare and Medicaid Services ("CMS") would not have made the correspondingly larger supplemental payments to the private hospitals.  Without the supplemental payments the private hospitals received as a result, the private hospitals would not have funded the "donation" of care to the public hospitals by the defendant and non-party medical schools.  Consequently, the private hospitals' payments to the medical schools to provide care at the public hospitals had a direct or indirect relationship to the supplemental payments that returned all or part of the value of the donation to the private hospitals.  That type of arrangement is not a bona fide donation under Medicare requirements. Furthermore, were it not for the private hospitals' donation of the cost of physicians' and other medical practitioners' services provided to Defendant public hospitals, HCHD/HHS would have paid for physician and other provider services directly, as was its responsibility to do.

17.     In addition to making improper in-kind, non-bona fide donations to HCHD/HHS,

Defendants AMS, BCM, and non-party co-conspirator UTHealth received payment for physicians' and non-physician providers' salaries that was much greater than fair market value ("FMV"). HCCS made these payments from the supplemental Medicaid payments its private affiliated hospitals received. The purpose of these supplemental payments was to fund the provision and expansion of under-compensated and uncompensated healthcare in Harris County. Instead, HCCS diverted huge portions of these funds to pay the medical schools for providers' salaries that were far above FMV in light of actual work performed—money that would otherwise have been used to deliver under-compensated and entirely uncompensated care. These above-FMV payments were not consistent with economy, efficiency, and quality of care, which Medicaid requires for supplemental payments, and they were unreasonable given the lack of any corresponding benefit to the Medicaid program, in violation of CMS's standards for UPL payments. *See* 42. C.F.R. § 447.200, § 447.204.

18.    As a result of Defendants' unlawful conduct, the United States has made Federal Financial Participation ("FFP") payments to the Texas Medicaid Program that benefit the private hospitals. The United States would not have made these payments but for Defendants' false and fraudulent schemes. Such claims that Defendants submitted and caused the State of Texas to submit for approval and payment of FFP funds to the United States, in the form of the state's quarterly CMS Form 64, were false and fraudulent within the meaning of the False Claims Act because, as a result of Defendants' knowing misconduct and in accordance with Defendants' intent, the amounts claimed, approved, and paid were higher than properly due under federal law.

19.    Furthermore, the Texas Medicaid Program, which is administered by the Texas Health and Human Services Commission ("HHSC"), has made supplemental Medicaid payments to Defendants to which they were not entitled, and will likely have to reimburse the federal government for the excessive payments.

III.    **PARTIES AND NON-PARTY CO-CONSPIRATOR**
    A.    **Defendant Private Hospitals and Related Entities**

20.    Defendant Harris County Clinical Services ("HCCS") is a certified nonprofit

health organization.  It is an umbrella organization comprised of the following private hospitals and private hospital systems: Memorial Hermann Health System, Christus Health, Christus Health Gulf Coast, St. Joseph Medical Center, HCA Healthcare (formerly HCA Holdings, Inc. d/b/a HCA Health Services of Texas), HCA Gulf Coast Division Inc., Houston Methodist, Texas Children's Hospital, and St. Luke's Episcopal Health System.  These private hospitals formed HCCS to fund the "donation" of physician and other provider services to HCHD/HHS to increase the Medicaid supplemental payments returned to the private hospitals.  HCCS purchases the providers' services through the contract with AMS, and manages the physicians and other providers who provide care at facilities throughout the Harris County Hospital District.  HCCS provides approximately $243 million of clinical services annually to patients at the public hospitals, although much of this cost is for physicians' and other providers' salaries that exceed FMV.

21.    Memorial Hermann Health System is the largest non-profit health system in the Houston area, comprised of over 40 different care facilities.  It is one of the private hospital systems that is a party to the collaboration and conspiracy between HCHD/HHS, HCCS and its affiliated private hospitals, and AMS and the medical schools, which all profit from the arrangement.  The mailing address for Memorial Hermann Health System is 929 Gessner Drive, Suite 2600, Houston, Texas.

22.    Christus Health is a Catholic health system that owns over 40 hospitals and facilities in seven states, including 27 in Texas.  It is one of the private hospital systems that is a party to the collaboration and conspiracy between HCHD/HHS, HCCS and its affiliated private hospitals, and AMS and the medical schools.  Christus Health's corporate headquarters are located at 919 Hidden Ridge in Irving, Texas.

23.    Christus Health Gulf Coast is a region of, and subsidiary of, the Christus Health system.  It operates three hospitals within the Houston area: Christus St. Joseph Hospital, Christus St. John Hospital, and Christus St. Catherine Hospital.  It is one of the private hospital systems that is a party to the collaboration and conspiracy between HCHD/HHS, HCCS and its

affiliated private hospitals, and AMS and the medical schools.  Its address is 2707 North Loop West, Suite 900, Houston, Texas.

24.     HCA Healthcare (formerly HCA Holdings, Inc. d/b/a HCA Health Services of Texas) is a healthcare system that has 55 locations within Texas, including locally-managed hospitals and freestanding surgery centers.  It is one of the private hospital systems that is a party to the collaboration and conspiracy between HCHD/HHS, HCCS and its affiliated private hospitals, and AMS and the medical schools.  Its corporate headquarters are located at One Park Plaza, Nashville, Tennessee.

25.     HCA Gulf Coast Division, Inc. is an affiliation of hospitals and facilities in the Houston and Southern Texas areas.  It is a division of HCA Healthcare, Inc.  It is one of the private hospital systems that is a party to the collaboration and conspiracy between HCHD/HHS, HCCS and its affiliated private hospitals, and AMS and the medical schools.  Its corporate office is located at 7400 Fannin St., Suite 650, Houston, Texas.

26.     Texas Children's Hospital is a non-profit organization providing pediatric care at several facilities in the Houston area.  It is one of the private hospitals that is a party to the collaboration and conspiracy between HCHD/HHS, HCCS and its affiliated private hospitals, and AMS and the medical schools.  Its main campus is located at 6621 Fannin St., Suite 2240, Houston, Texas.

27.     Non-profit St. Luke's Episcopal Health System is part of Catholic Health Initiatives, a large national health system.  St. Luke's consists of a number of hospitals and care facilities in the Houston area.  It is one of the private hospital systems that is a party to the collaboration and conspiracy between HCHD/HHS, HCCS and its affiliated private hospitals, and AMS and the medical schools.  It is located at 6720 Bertner St., Houston, Texas.

28.     Houston Methodist (formerly the Methodist Hospital System) is a private hospital system.  Houston Methodist Hospital is the flagship hospital of the system.  Houston Methodist is one of the private hospital systems that is a party to the collaboration and conspiracy between HCHD/HHS, HCCS and its affiliated private hospitals, and AMS and the medical schools.  Its

headquarters are located at 6565 Fannin Street, Houston, Texas.

29.     St. Joseph Medical Center is a private general acute care hospital located in Houston.  It is one of the private hospital systems that is a party to the collaboration and conspiracy between HCHD/HHS, HCCS and its affiliated private hospitals, and AMS and the medical schools.  It was owned by Christus Health until 2006, when it was sold to Hospital Partners of America (HPA).  In 2011, it was sold again to Iasis Healthcare.  It is located at 1401 St. Joseph Parkway, Houston, Texas.

**B.     Defendant Public Hospitals**

30.     Defendant Harris County Hospital District d/b/a Harris Health System (referred to as "HCHD/HHS") is the county hospital system that provides care for residents—both the indigent/uninsured and those able to pay—of Harris County, Texas.  It is made up of over 25 entities such as community health centers, clinics, and three hospitals:  Ben Taub Hospital, Lyndon B. Johnson Hospital, and Quentin Mease Community Hospital.  According to its website, Harris County Hospital District changed its business name to Harris Health System in 2012.  The name change was merely a rebranding effort, and did not involve any changes to the entity's ownership or relationships with the other Defendants or the non-party co-conspirator.  Because the allegations in this Complaint include conduct before and after the name change, the Complaint will refer to Harris County Hospital District and Harris Health System as HCHD/HHS.  HCHD/HHS provides care for the indigent and uninsured patients of Harris County and receives property tax revenues for this purpose, according to its financial statements.  HCHD/HHS is a legally separate component governmental unit of Harris County, governed by a board whose members are appointed by the Harris County Commissioner's Court.  Harris County itself does not hold title to any of the System's assets or have any right to budget surpluses from HCHD/HHS.  HCHD/HHS's corporate address is 17203 1/2 Hall Shepperd Road, Houston, Texas.

31.     Defendant Ben Taub Hospital ("Ben Taub") is one of three hospitals within HCHD/HHS.  It is staffed by physicians, residents, and other providers from BCM "donated"

under the Harris Collaborative Program.  Ben Taub is located at 1504 Taub Loop, Houston, Texas, 77030.  It is a Medicaid Disproportionate Share Hospital ("DSH").

32.     Defendant Lyndon B. Johnson Hospital ("LBJ") is one of three hospitals within HCHD/HHS.  It is staffed by physicians, residents, and other providers of UTHealth "donated" through the Harris Collaborative Program.  LBJ is located at 5656 Kelley Street, Houston, Texas 77026.  It is a Medicaid Disproportionate Share Hospital.

33.     Defendant Quentin Mease Community Hospital ("Quentin Mease") is one of three hospitals within HCHD/HHS.  It is staffed by physicians, residents, and other providers of BCM "donated" through the Harris Collaborative Program.  Quentin Mease is located at 3601 North MacGregor Way, Houston, Texas 77004.  It is a Medicaid Disproportionate Share Hospital.

**C.     Defendant Medical Schools**

34.     Defendant Baylor College of Medicine ("BCM") is a medical school located in Houston, Texas, and incorporated in Texas.  Its corporate address is 1 Baylor Plaza, Houston, Texas.  BCM has a 50% ownership interest in Affiliated Medical Services.  BCM receives payments over FMV for its physicians' and other providers' services.  BCM retains this excess money, which should instead be used for the provision of under-compensated and uncompensated care delivered to indigent and uninsured patients by the Defendant private hospitals that are paying the cost of the inflated bills.  BCM's leadership was aware it received the benefit of payments over FMV for physicians' services through the arrangement between HCHD/HHS, HCCS, and the medical schools.  Julie Nickell, the current VP and CFO of BCM, was responsible for managing the financial well-being of BCM's private practice.  In addition, she was brought onto the team at BCM that managed AMS, and attended the weekly AMS and HCHD/HHS meetings.

35.     Defendant BaylorMedCare is the physician practice of BCM.  It is a Texas nonprofit corporation and tax-exempt entity that is owned and controlled by BMC.  BMC is the sole member of BaylorMedCare.  BCM formed BaylorMedCare in 1994 to centralize the private practices of the physicians within the academic departments of BCM and to contract with third

parties to provide health care services within the community.  The physicians who were contracted by the private hospitals to provide services at the public hospitals were affiliated with BaylorMedCare.  BaylorMedCare also handled the billing for these providers' services. BaylorMedCare's address is 1 Baylor Plaza, Houston, Texas.

36.     Defendant UT Physicians is the group practice of UTHealth, a state school. However, upon information and belief, UT Physicians is not immune for purposes of sovereign immunity.  *See, e.g., Lenoir v. U.T. Physicians*, 491 S.W.3d 68 (Tex. App. 2016), *reh'g overruled* (June 23, 2016).  UT Physicians employed the physicians and other providers who were contracted by the private hospitals to provide services at the public hospitals, and handled the billing for these providers.  UT Physicians' leadership knew it received the benefit of payments over FMV for physicians' services through the arrangement between HCHD/HHS, HCCS, and the medical schools.  In 2012, the current CEO and former Dean of UT Physicians, Dr. Giuseppe Colasurdo, appointed Carmel Dyer to be responsible for AMS, and to be Chief of Staff at Lyndon B. Johnson Hospital, one of the HCHD/HHS hospitals.  Dr. Colasurdo was aware that the medical schools received exorbitant profits from the arrangement.  Andrew Casas, COO of UT Physicians, was also aware that the medical schools received payments in excess of FMV.  Others at UT Physicians, such as Associate Dean of Clinical Business Affairs at UTHealth, Julie Page, and Dr. Jose Garcia, a physician at UT Physicians and Director and Assistant Director of AMS, were aware of the relationship between the donation of physician services, the IGT, and receipt of supplemental payment.  UT Physicians' corporate address is PO Box 20627, Houston, Texas.

37.     Defendant Affiliated Medical Services, Inc. ("AMS") is a non-profit community health system organization based in Houston, Texas that is owned in equal parts by BCM and UTHealth (the medical schools).  AMS acts as a pass-through entity for the medical schools, with no employees of its own, and it entered the contract at issue with Harris County Clinical Services, Inc. on behalf of the medical schools.  This contract is at the heart of what Defendants and UTHealth call the Harris Collaborative Program.  Under the contract, the medical schools

provide the physicians and non-physician providers who staff HCHD/HHS facilities. The money private hospitals pay for physician and other mid-level provider services delivered at the public hospitals flows through AMS in order to reach the medical schools. In 2015, for example, AMS reported $239 million in income, which it passed through to BCM and UTHealth. AMS is located at 5656 Kelley Street, Suite LBJ-NT91002, Houston, Texas.

> ### D.    **Plaintiff/Relator**

38.     *Qui Tam* Plaintiff/Relator Kent Vaughn ("Relator") is a resident of Texas. He is a former employee of HCHD/HHS, where he worked as the Associate Administrator for Provider Practices and Contracting from 2010 until he was terminated on February 11, 2016. His main responsibility was to oversee and amend contractual relationships between HCHD/HHS, BCM, UTHealth, and HCCS. Relator was terminated in retaliation for his attempts to bring the problems with the Harris Collaborative program, as alleged herein, to light.

## IV.    **NON-PARTY CO-CONSPIRATOR UTHEALTH**

39.     Non-party co-conspirator University of Texas Health Science Center at Houston ("UTHealth") is a component of the University of Texas System, a public university system. UTHealth houses various schools, including the John P. and Kathrine G. McGovern Medical School. Its main office is located at 7000 Fannin, Suite 1800, Houston, Texas.

40.     UTHealth has a 50% ownership interest in AMS, and receives payments well over FMV for physician and other provider services it delivers through the contract between AMS and HCCS. As a result, UTHealth retains this money that should instead be used for the provision of under-compensated and uncompensated care delivered to indigent and uninsured patients care by the affiliated hospitals.

41.     UTHealth was aware that it received payments that exceeded FMV from the arrangement between HCHD/HHS, HCCS, and the medical schools. Kevin Dillon, the current Senior Executive VP, COO, and CFO of UTHealth, was CFO when the arrangement was negotiated. He also is treasurer of UT Physicians.

42.     Upon information and belief, non-party co-conspirator UTHealth is a

governmental entity for purposes of sovereign immunity.  *See, e.g., United States ex rel. King v. Univ. of Tex. Health Sci. Ctr.-Houston*, 544 F. App'x 490 (5th Cir. 2013).

43.     The Supreme Court has held that entities such as UTHealth cannot be named defendants by a relator in a *qui tam* action due to lack of clarity over whether Congress intended to waive States' sovereign immunity by including them among the class of undefined "person(s)" that may be named as False Claims Act defendant in *qui tam* actions brought by private individuals acting on behalf of the United States.  *See Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765 (2000).  However, that decision has left open the possibility that the United States (which has the inherent power to sue States for damages) may pursue FCA remedies in suits it initiates against State entities.  Any such recoveries that the United States might collect directly from State entities in lieu of collections it could pursue against non-State entities would be alternative remedies within the meaning of the FCA to the FCA remedies sought by relator herein against the named defendants in this action.

44.     Furthermore, as alleged below, UTHealth conspired with the named Defendants to violate the False Claims Act.  The named Defendants are thus liable for the acts of their non-party co-conspirator in furtherance of the conspiracy.

## V.     JURISDICTION AND VENUE

45.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

46.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because Defendants have minimum contacts with the United States.  Moreover, Defendants can be found in and transact business in the Southern District of Texas.

47.     Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. § 1391(b), 28 U.S.C. § 1395(a), and 31 U.S.C. § 3732(a) because the Defendants can be found in, and/or transact or have transacted business in, this District.  At all times relevant to this

Complaint, Defendants regularly conducted, and continue to conduct, substantial business within this District, and/or maintain employees and offices in this district.  Defendants' principal place of business is in this District, and many of the acts described in this Complaint occurred in this District.

## VI.   APPLICABLE LAW
### A.   The False Claims Act

48.     Congress originally enacted the FCA during the Civil War and substantially amended the Act in 1986—and, again, in 2009 and 2010—to enhance the ability of the United States to recover losses sustained as a result of fraud against it.  Congress amended the FCA after finding that fraud in federal programs was pervasive and that the statute, which Congress characterized as the primary tool for combating fraud against the government, needed modernization.  Congress amended the FCA to create incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisals or government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the government's behalf.

49.     The FCA prohibits, among other things, (a) knowingly presenting (or causing to be presented) to the federal government a false or fraudulent claim for payment or approval; (b) knowingly making, using, or causing to be made or used, any false record or statement material to a false or fraudulent claim; (c) knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government; and (d) conspiring to violate any of the previous sections of the FCA.  31 U.S.C. §§ 3729(a)(1)(A)-(C), (G).  Any person who violates the FCA is liable for a civil penalty for each violation, plus three times the amount of the damages sustained by the United States.  31 U.S.C. § 3729(a)(1).

50.     For purposes of the FCA, a person "knows" a claim or statement is false if that person: "(i) has actual knowledge of [the falsity of] the information; (ii) acts in deliberate

ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1). The FCA does not require proof that a defendant specifically intended to commit fraud. *Id.*

51.     Any person with information about an FCA violation may act as a relator, may bring a *qui tam* action on behalf of the United States, and may share in any recovery. The FCA requires that the *qui tam* complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

      **B.**     **The Texas Medicaid Fraud Prevention Act**

52.     The Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. §§ 36.001, *et seq.* is modeled after the federal False Claims Act, and creates liability for anyone who "knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning…information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program." § 36.002(4)(B). It also creates liability for anyone who "knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program." § 36.002(5).

53.     Like the federal False Claims Act, the Texas Medicaid Fraud Prevention Act allows for actions brought by private individuals on behalf of the state. § 36.101(a). If the State intervenes, the private party will receive at least 15 but no more than 25 percent of the proceeds of the action. § 36.110(a). If the State declines to intervene, the private party bringing the action is entitled to at least 25 percent but no more than 30 percent of the proceeds. *Id.*

      **C.**     **The Medicaid Program**

54.     The healthcare program involved in this action is Medicaid.

55.     Title XIX of the Social Security Act (the "Medicaid Act") authorizes federal

grants to the states for Medicaid programs to provide medical assistance to persons with limited income and resources.  42 U.S.C. §§ 1396, *et seq.*

56.     Medicaid programs are administered by the states in accordance with federal statutes and regulations and according to a Medicaid state plan and any state plan amendments ("SPAs"), which must be approved by the Center for Medicare and Medicaid Services ("CMS"). 42 C.F.R. §§ 430.0, 430.10-11.  CMS is the agency within the Department of Health and Human Services that administers Medicaid at the federal level.

57.     To carry out the mandates of the Medicaid program, the state Medicaid agency pays providers for medical care and services provided to eligible Medicaid recipients.  Providers that wish to participate in the Medicaid program must agree to comply with certain requirements specified in a provider agreement.

58.     While Medicaid programs are administered by the states, they are jointly financed by the federal and state governments.  The federal government pays its share of medical assistance expenditures to the state on a quarterly basis according to: (1) statements of expenditures submitted by the state to CMS on a CMS 64 Form, *see* 42 C.F.R. § 430.30(c), and (2) a formula used to calculate how much of the total reported expenditures the federal government will reimburse the state, as described in sections 1903 [42 U.S.C. § 1396b] and 1905(b) [42 U.S.C. § 1396d(b)] of the Medicaid Act.  The amount of the federal share of medical assistance expenditures is called Federal Financial Participation ("FFP").  42 C.F.R. § 430.1.  The state pays its share of medical assistance expenditures from state and local government funds in accordance with the requirements of section 1902(a)(2) [42 U.S.C. § 1396a(a)(2)] of the Medicaid Act.

59.     Different levels of federal funding are provided to different states, depending on need.  The minimum federal matching rate share is 50% of total program costs.  The federal government calculates the precise level of federal funding for each state every federal fiscal year. In Texas, the annual federal share of Medicaid expenditures, called the Federal Medical Assistance Percentage (FMAP), during the period relevant to this Complaint has ranged between

the below percentages of the program costs:

| Year | FMAP |
|------|--------|
| 2008 | 60.53% |
| 2009 | 59.44% |
| 2010 | 58.73% |
| 2011 | 60.56% |
| 2012 | 58.22% |
| 2013 | 59.30% |
| 2014 | 58.69% |
| 2015 | 58.05% |
| 2016 | 57.13% |
| 2017 | 56.18% |

In other words, for every dollar Texas spent to fund its Medicaid program, the federal government reimbursed Texas roughly between $0.56 and $0.61.

60.     The remaining percentage is the state's share of Medicaid program costs.  Most states fund their share through state revenues and intergovernmental transfers of local government funds such as tax revenue and publicly-owned provider funds.

**D.     State-Funding Abuses Through Non-Bona Fide Provider Donations**

61.     Because of past abuses that have undermined the proper balance in Medicaid financing provided respectively by the state and federal governments, since 1991, federal Medicaid regulations have excluded from FFP state medical assistance expenditures for which the states' and/or their local government entities' share of Medicaid costs are obtained from provider donations or revenues generated by certain healthcare-specific taxes.  *See* 42 C.F.R. §§ 433.50, *et seq*.

62.     Specifically, the Health Care Financing Administration, the predecessor to CMS, was concerned that states were using private provider donations to fund the non-federal share of Medicaid payments.  By relying on private provider donations, rather than state money, states circumvented their obligation under the Medicaid Act to expend funds for medical assistance.

*See* Medicaid Program; State Share of Financial Participation, 56 Fed. Reg. 46,380, 46,382 (Sept. 12, 1991).

63.     Under section 1903(w) [42 U.S.C. § 1396b(w)] of the Medicaid Act and its implementing regulations, *see* 42 C.F.R. § 433.52, a reduction in FFP will occur if a state receives "provider-related donations" (in cash or kind) made by, or on behalf of, health care providers unless the donations either are "bona fide" donations or meet out-stationed eligibility worker donation requirements (which are not relevant here).  42 C.F.R. § 433.67(b).  Such a reduction in FFP is an administrative remedy against the state which does not prohibit additional remedies against wrongdoers that knowingly violate the False Claims Act.  The regulations also specify the types of health care-related taxes (which are also not relevant here) a state is permitted to receive without a reduction in FFP.  *Id.* §§ 433.70(a); 433.68.

64.     A provider-related donation made to a state or unit of local government is considered "bona fide" only if it has no direct or indirect relationship to Medicaid payments to the health care provider, any related entity providing health care items and services, or other providers furnishing the same class of items or services as the provider or related entity.  Provider-related donations will be determined to have no direct or indirect relationship to Medicaid payments only if those donations are not returned to the individual provider, the provider class, or any related entity under a "hold harmless provision or practice" as those terms are described in the regulations.  42 C.F.R. § 433.54(a) & (b).

65.     A hold harmless practice exists if any of the following applies:

1.      The State (or other unit of government) provides for a direct or indirect non-Medicaid payment to those providers or others making, or responsible for, the donation, and the payment amount is positively correlated to the donation.  A positive correlation includes any positive relationship between these variables, even if not consistent over time.

2.      All or any portion of the Medicaid payment to the donor, provider class, or related entity, varies based only on the amount of the donation, including where

Medicaid payment is conditional on receipt of the donation.

3.     The State (or other unit of government) receiving the donation provides for any direct or indirect payment, offset, or waiver such that the provision of that payment, offset, or waiver directly or indirectly guarantees to return any portion of the donation to the provider (or other parties responsible for the donation).

*Id*. § 433.54(c).

66.     Moreover, while CMS generally will "presume" that provider-related donations by a privately-owned and operated health care organizational entity to a local entity of government are bona fide if they do not exceed $50,000 per year, to the extent that even such small annual donations actually contain a hold harmless provision as described in 42 C.F.R. § 433.54(c), they will not be considered bona fide donations.  *Id*. § 433.54(d) & (e).

67.     "Donations" from privately-owned-and-operated healthcare providers to state or local governments that are used, directly or indirectly, for the purpose of fulfilling state matching-fund obligations to the Medicaid program for the benefit of the "donating" provider thus do not meet the definition of "bona fide" donations that are exempt from reductions in FFP. The result of such arrangements is that there is no true state or local government-funded match of federal funds used to pay such Medicaid expenditure.  Rather, there is only a non-bona fide "donation" of funds by the provider hospital itself, which is ultimately returned to the hospital through hold harmless agreements and practices—along with additional "matching" funds from the federal government—within at least a year of the so-called "donation."

68.     Under such improper arrangements, private providers make it possible for state or local government officials to substantially increase federal Medicaid payments to the providers at no commensurate cost increase to state or local governments.  Such arrangements thus under-mine the safeguards Congress designed into the Medicaid program to condition certain categories of federal Medicaid spending (up to established overall limits) on the willingness of state and local governments to bear a defined, fair portion of the extra costs in exchange for the additional benefits such payments provide Medicaid participants within their jurisdictions.

69.     Federal law mandates that all such donations be reported to the federal government and be documented.  42 C.F.R. § 433.74.  Federal law also mandates at the administrative level that, where the existence and amount of such donations are reported, Federal Financial Participation in Medicaid funding must be reduced in proportion to the amount of all provider-related donations that are not bona fide within the meaning of the regulations.  42 C.F.R. §§ 433.66, 433.74(d).  No discretionary exceptions exist.

70.     In a guidance letter to state Medicaid Directors published on May 9, 2014, CMS reiterated that "Government entities are free to enter into agreements with private entities," *except* if there is a hold harmless provision in the agreement.  Cindy Mann, CMS State Medicaid Director Letter, SMDL No.14-004 (May 9, 2014).  "A hold harmless practice exists if there is a positive correlation between the agreement and the Medicaid payments, Medicaid payments are conditioned upon the receipt of a donation from a private entity, or if there is a guarantee that the private entity will see a return of some, or all, of that donation through a Medicaid payment," whether directly or indirectly.  *Id.*  Where there is an "effective return of some, or all, of the donation to the private provider through Medicaid supplemental payments, a hold harmless arrangement exists."  *Id.*  Arrangements are "not considered bona fide, and…the Centers for Medicare & Medicaid Services (CMS) will not approve any SPAs [state plan amendments] that include non-bona fide donations as a portion, or all, of the non-Federal share of the Medicaid payments.  Payment methodologies contingent upon the receipt of a non-bona fide donation would also be grounds for disapproval of a SPA."  *Id.*

71.     CMS's guidance letter also directed that where a governmental unit, such as HCHD/HHS, cedes its responsibility—such as the responsibility to retain physicians and other healthcare providers at public hospitals—to a private entity through a provider arrangement, this would not be bona fide.  "Any arrangement…that obligate[s] a private hospital to either assume the programmatic responsibility of a unit of government or sign lease agreements at an amount that is greater than fair market value would be considered a hold harmless arrangement.  The donation would not be considered bona fide when such arrangements are tied *in any way*,

directly or indirectly, to Medicaid reimbursement under the Medicaid state plan." *Id.* (emphasis in original).

72.     Furthermore, non-bona fide "supplemental payments or other forms of increased payments based on the arrangements described above raise concerns with the Medicaid program's requirement for payments to be consistent with economy, efficiency, and quality of care to the extent that the overall payment exceeds the amount payable to other providers of the same services…these payments are not consistent with section 1902(a)(30)(A) of the Act because they are not economical and efficient." *Id.*; *see also* 42. C.F.R. § 447.200.

      **E.**    **The Texas Medicaid Supplemental Payment Programs**

73.     To promote efficiency, economy, and quality of care, CMS imposes a cap on the amount of money a state may reimburse Medicaid providers that qualifies for federal matching funds; this cap is known as the Medicaid Upper Payment Limit ("UPL"). *See* Medicaid Program; Revision to Medicaid Upper Payment Limit Requirements for Hospital Services, Nursing Facility Services, Intermediate Care Facility Services for the Mentally Retarded, and Clinic Services, 66 Fed. Reg. 3148, 3148 (Jan. 12, 2001); *Ark. Dep't. of Human Servs. v. Sebelius*, 818 F. Supp. 2d 107, 109 (D.D.C. 2011).

74.     The UPL program allows states to reimburse hospitals and other Medicaid providers for certain uncompensated care at a rate equal to what Medi*care* would reimburse for the same service. 42 C.F.R. § 447.272. Because state Medicaid programs often pay less for a given service than Medicare would for the same service, state Medicaid payments are often less than the UPL, which is based on Medicare reimbursement methodology. States that wish to obtain the maximum amount of federal financial participation can make supplemental payments to providers and receive corresponding federal matching funds up to the UPL. In addition to UPL payments, supplemental payments may also be made under other Medicaid programs, such as an 1115 Waiver or Disproportionate Share Hospital payments.

75.     There is not a single UPL per state. Rather, UPLs are calculated in an aggregate amount for different kinds of services (inpatient hospital services, outpatient hospital services,

nursing facility services, physician and other practitioner services, and services provided in intermediate care facilities for the developmentally disabled) provided by three categories of providers: (1) state government-owned or operated facilities; (2) other government facilities; and (3) privately owned and operated facilities.  Medicaid Program; Revision to Medicaid Upper Payment Limit Requirements for Hospital Services, Nursing Facility Services, Intermediate Care Facility Services for the Mentally Retarded, and Clinic Services, 66 Fed. Reg. 3148, 3148 (Jan. 12, 2001); 42 C.F.R. § 447.321.

76.     Prior to December 2011, private hospitals and other facilities in Texas found themselves facing a shortfall due to the high cost of providing uncompensated indigent care and received supplemental payments from the UPL Supplemental Payment Program.  These supplemental payments were essentially pools of money that were disbursed to providers according to a formula in compliance with statutory limits.  In this case, the amount of money that Defendant private hospitals received was impermissibly dictated by the amount of money that a public entity, HCHD/HHS, transferred to the state Medicaid Program using cost savings attributable to donations made by the same private hospitals.  The State would use these IGT funds to maximize state and federal medical assistance expenditures.  Although federal law permits states to finance up to 60 percent of the state Medicaid share from local government funds, 42 U.S.C. § 1396a(a)(2), 42 C.F.R. § 433.53(b), those funds may not come from donations that are related to Medicaid payments the donors or related entities receive.  *See* 42 C.F.R. § 433.54.

77.     In December 2011, the Texas Health and Human Services Commission received a waiver from CMS under Section 1115 of the Social Security Act.  An "1115 waiver" allows a state greater freedom in structuring programs to deliver Medicaid benefits to patients by, among other things, creating Medicaid experimental, pilot, or demonstration projects to test new approaches to delivering health care services, and authorizing states to make demonstration supplemental payments.  *See* 42 U.S.C. § 1315(a); 1 Tex. Admin. Code § 355.8201.  The 1115 waiver permitted Texas to expand Medicaid coverage by providing supplemental payments from

an uncompensated care pool or delivery system reform incentive payment ("DSRIP") program under a new methodology.  However, under the 1115 waiver, UPL affiliation agreements with private hospitals that met the requirements of the 1115 waiver were allowed to remain in place and hospitals could continue receiving supplemental payments through the existing arrangement, although payment methodologies may have been subject to change after the first year of the waiver.

78.    Whenever privately owned and operated hospitals participate in Texas's Medicaid Supplemental Payment Program by becoming parties to an Indigent Care Affiliation Agreement, they must sign a certification of hospital participation with the Texas Health and Human Services Commission.  *See* Ex. 1.  Submission of this certification is necessary to receive any Medicaid supplemental payment.  1 Tex. Admin. Code § 355.8201(c)(1)(B).

79.    The certification stipulates that the hospital has not entered and will not enter into "any agreement with the Governmental Entity to condition either the amount of the Public Funds transferred by the Governmental Entity or the amount of Medicaid supplemental payments Hospital receives on the amount of indigent care Hospital has provided or will provide" or to "condition the amount of Hospital's indigent care obligation on either the amount of Public Funds transferred by the Governmental Entity to HHSC or the amount of Supplemental Payment Hospital may be eligible to receive."

80.    Furthermore, the agreement forbids the hospital or any entity acting on its behalf as part of such an agreement from making "cash or in-kind transfers to the Governmental Entity other than transfers and transactions" unless those payments or transfers "are unrelated to the administration of the Supplemental Payment Program and/or the delivery of indigent care services; constitute fair market value for goods and/or services rendered or provided by the Governmental Entity to Hospital, and represent independent, bona fide transactions negotiated at arms-length and in the ordinary course of business between Hospital and the Government Entity." (emphasis added).

81.    The agreement forbids a participating hospital from having "[t]aken assignment or

[having] agreed to take an assignment of a contractual or statutory obligation of the Governmental Entity" or from having "[a]uthorized or consented to the assumption of a statutory or contractual obligation of the Governmental Entity by an Affiliated Hospital or any other entity acting on behalf of an Affiliated Hospital or group of Affiliated Hospitals." (emphasis added).

82.     The agreement also certifies that for any financial account or mechanism utilized in connection with an indigent care affiliation agreement or an IGT issued, the "amount of any Account is not conditioned or contingent on the amount of indigent care services that an Affiliated Hospital provided or will provide…and… [A]ny such Account will not be used to effect a quid pro quo for the provision of indigent care services by or on behalf of the Affiliated Hospitals." (emphasis added).

83.     The certification also notes that private hospitals that are a party to such agreements receive supplemental Medicaid payments pursuant to Section (z) of Attachment 4.19-A, Methods and Standards for Establishing Payment Rates – Inpatient Hospital Services, which requires that "[N]o payment under this section is dependent on any agreement or arrangement for providers or related entities to donate money or services to a governmental entity that HHSC is aware of."

84.     The certification further stipulates that if CMS or another authority "disallows, defers, or otherwise rejects, in whole or in part, a claim for federal financial participation based on a claim submitted by Hospital to HHSC for health care services provided under the Affiliation Agreement, HHSC will have the right, by set-off or recoupment, to recover the amount disallowed, deferred, or rejected by CMS, subject to Hospital's rights of administrative appeal."

85.     Defendant private-affiliated hospitals were required to sign this certification of hospital participation with the Texas Health and Human Services Commission to participate in the Texas Medicaid Supplemental Payment program.

86.     The participating governmental entities, in this case HCHD/HHS, must sign a similar certification of participation.  The certification of governmental entity participation requires entities to certify that:

> All transfers of Public Funds…to HHSC to support the Supplemental payments to the Affiliated Hospitals under the Supplemental Payment Program comply with: (i) The applicable regulations that govern provider-related donations codified at section 1903(w) of the Social Security Act (42 U.S.C. § 1396b(w)), and Title 42, Code of Federal Regulations, Part 433, subpart B, sections 433.52 and 433.54; (ii) The conditions approved by the federal Centers for Medicare and Medicaid Services ('CMS') for governmental entities' and private hospitals' participation in the Supplemental Payment Program; and (iii) HHSC administrative rules codified at Title 1, Texas Administrative Code, chapter 355, Subchapter J, Division 4, section 355.8070.

87.     The governmental entities further certify that they "ha[ve] not and will not enter into any agreement to condition either the amount of the Public Funds transferred by the Governmental Entity or the amount of Medicaid supplemental payments an Affiliated Hospital receives on the amount of indigent care the Affiliated Hospital has provided or will provide;" and that they "ha[ve] not entered and will not enter into any agreement to condition the amount of any Affiliated Hospital's indigent care obligation on either the amount of Public Funds transferred by the Governmental Entity to HHSC or the amount of Supplemental Payment an Affiliated Hospital may be eligible to receive."

88.     Furthermore, the governmental entity must certify that it "has not received and will not receive refunds of payments the Governmental Entity made or makes to an Affiliated Hospital for any purpose in consideration for an IGT of Public Funds by the Governmental Entity to HHSC to support Supplemental Payments."

89.     The governmental entity also must represent that it "has not received and will not receive any cash or in-kind transfers from an Affiliated Hospital or any other entity acting on behalf of an Affiliated Hospital or group of Affiliated Hospitals" unless those payments or transfers "are unrelated to the administration of the Supplemental Payment Program or the delivery of indigent care services under an Affiliation Agreement; [c]onstitute fair market value for goods or services rendered or provided by the Governmental Entity to an Affiliated Hospital; and [r]epresent independent, bona fide transactions negotiated at arms-length and in the ordinary course of business between the Affiliated Hospital and the Governmental Entity."

## VII.    FACTUAL ALLEGATIONS
### A.    HCCS, the Affiliated Providers, AMS, and the Medical Schools Entered an Agreement Conditioned on the Return of Supplemental Payments

90.    In 2007, a group of private hospitals in Texas began negotiating a collaboration with the public hospital system of Harris County, Texas, for the purpose of increasing the supplemental Medicaid payments the private hospitals received.  The negotiation was based on changes to an earlier 20-year long agreement between the medical schools (through AMS) and the public hospital system (at that time, HCHD).  Because HCHD never had enough funds to maximize their IGTs to the Texas Health and Human Services agency, the corresponding amount of matching federal Medicaid funding, including supplemental Medicaid payments to the private hospitals, was never as large as it could be if Texas were to provide a greater amount of non-federal funding for CMS to match with federal funds.  That is, the private hospitals could receive much greater supplemental payments if the county had more cash available to transfer to the state to fund the mandatory non-federal share.  The purpose of the collaboration was to remedy that situation by fraudulently maximizing the federal financial participation the state received for its Medicaid program, which would ultimately be returned to the private hospitals as supplemental Medicaid payments.

91.    The group of private hospitals—comprised of Defendants HCA Gulf Coast Division Inc., Memorial Hermann Health System, Christus Health, Christus Health Gulf Coast, St. Joseph Medical Center, HCA Healthcare, Houston Methodist, Texas Children's Hospital, and St. Luke's Episcopal Health System—formed a certified non-profit health organization, Harris County Clinical Services Inc. ("HCCS"), through which they would pay for provider services for the Harris County Hospital District as part of the affiliation, known as the Harris Collaborative program.  Memorial Hermann Health System was one of the main architects of the collaboration.

92.    On July 1, 2008, HCCS entered an affiliation agreement with AMS under which HCCS would pay AMS to provide physicians and other providers to patients within HCCS/HHS.  AMS had been formed in 1989 by BCM and UTHealth to contract with HCHD, in the precursor

to the 2008 contract.  BCM and UTHealth each own a 50% interest in AMS.

93.     AMS—which itself merely acts as a pass-through entity to transfer money from HCCS to BCM and UTHealth—subcontracted with BCM and UTHealth to arrange for physicians, residents, and other healthcare professionals to serve patients in the three Harris County Hospital District hospitals: Ben Taub General Hospital, Lyndon B. Johnson General Hospital, Quentin Mease Community Hospital, as well as other Harris County healthcare facilities.  In exchange, HCCS pays the medical schools, through AMS, for these services. Although HCHD/HHS is not a party to this contract, HCHD/HHS serves as the operating manager pursuant to a separate agreement, and it is a direct beneficiary of the contract.

94.     Through HCCS, the private hospitals pay AMS (and, by extension, the medical schools) hundreds of millions of dollars each year for physicians and other practitioners to staff HCHD/HHS facilities.  HCHD/HHS records the cost of these physicians' and other providers' services in its records as expenses, even though it is not actually expending money on physician and other provider services because HCCS is purportedly "donating" and paying for the physicians and other practitioners.  For example, in 2014, HCHD/HHS recorded expenses for physician services related to the affiliation agreement of $177 million, and in 2015, of $188 million.

95.     Because the affiliation agreement has removed the need for HCHD/HHS to pay for physicians and other practitioners, the arrangement has freed up funds for HCHD/HHS to use for other purposes.  As agreed among the conspiring group, HCHD/HHS uses the money it saves to increase the amount it transfers to the state Medicaid agency on behalf of the private hospitals. HCHD/HHS has transferred millions of dollars annually to the state via IGT.  According to its Financial Statements, in 2014, HCHD/HHS transferred $158.2 million, and in 2015, $196.3 million, as its contribution to the non-federal share of the Medicaid program.  These amounts would not have been available to HCHD/HHS had it instead been using its own funds to contract with AMS to pay for provider services in county hospitals, as HCHD/HHS had done before the affiliation agreement.

96.     The Texas Medicaid agency, HHSC, uses those donation-based IGTs to fund the non-federal share and draw down federal financial participation.  CMS then returns matching federal dollars to the state for its Medicaid expenditures, based on how much money Texas has supplied as its share of the Medicaid agreement.  The uncompensated care payments are distributed by the Texas Health and Human Services agency quarterly.  Some of this money has gone to the affiliated hospitals, which in turn have used it in part to pay AMS for physician and other provider services via HCCS.  Each year, HCCS has spent over $200 million of the supplemental payments its affiliated hospitals received on purchasing physician and other practitioner services from AMS and the medical schools.

97.     Although BCM and UTHealth do not directly receive supplemental Medicaid payments, the medical schools were incentivized to join the Collaborative Program because they would receive large payments, far beyond market value, for their physicians' (and other health-care providers') services.  Elizabeth "Beth" Cloyd, the Executive VP of Clinical Operations and Chief Nurse Executive at HCHD/HHS, was also the lead negotiator on the AMS-HCCS agreement on behalf of the private affiliated hospitals, pursuant to a facilities management agreement that allowed her to perform this role while simultaneously working for HCHD/HHS.  Ms. Cloyd told Relator that in 2008, when the Collaborative Program contract negotiations were ongoing, the medical schools demanded exorbitant compensation for their physicians' services.  At the time the contract was negotiated, the medical schools—particularly BCM—faced serious financial trouble, and saw this contract as an opportunity to line their pockets.

98.     HCCS' and its affiliated hospitals' donation of provider services was conditioned on making up the cost of the donation through supplemental payments.  Without the return of the value of the donation—plus some—in the form of supplemental payments, HCCS and the affiliated hospitals would never have been able to afford to pay for providers' services for HCHD/HHS, nor would they have had any incentive to do so.  Consequently, the purpose of the contract would have been moot.

99.     HCHD/HHS originally placed the responsibility to manage the AMS-HCCS

contract, including reviewing and approving these invoices, not with the Finance Department, but rather with Beth Cloyd, the Executive VP of Clinical Operations and Chief Nurse Executive. It was common knowledge at HCHD/HHS that management made this decision because it was afraid that if the Finance employee who calculated IGT amounts was the same person reviewing the HCCS-AMS invoices, the scheme's structure would be exposed, likely putting an end to the unlawful arrangements.

100.    In 2010, HCHD/HHS hired Relator as the Associate Administrator of Provider Practices and Contracting.  He was supervised by Beth Cloyd.  His primary responsibilities were managing the contract between AMS and HCCS, improving relationships between HCHD/HHS and the medical school partners, and approving AMS invoices.

101.    HCHD/HHS tracks individual physician and other providers' production, through the electronic medical record system at the public hospitals, quantified in relative value units ("RVUs").  RVUs are a measure Medicare uses to calculate physician reimbursement that takes into account the physician's time and skill required, practice expenses, and malpractice insurance.  The electronic medical record systems at HCHD/HHS facilities communicate directly with the systems used by BCM and UTHealth.  Through this link, HCHD/HHS transmits information on physicians' work each day to the medical schools.  Once such information arrives at the medical schools, each clinical department of each school prepares an invoice for their physicians which is consolidated by their respective schools to generate a monthly invoice report.

102.    AMS, on behalf of the medical schools, has sent invoices for providers' salaries, call pay, fringe benefits, overhead and other costs allowed under the Collaborative Program each month to HCCS.

103.    In addition to sending the invoices to HCCS, the medical schools have also sent this monthly invoice report to HCHD/HHS.  Those monthly reports arrived at Relator's department at HCHD/HHS, where he and Amy Agustin Lo, a CPA working in the same group as Relator, checked the calculations and assessed the reasonableness of the physicians' salaries and

on-call pay to the extent possible.  However, Relator and Ms. Lo could not audit physician and other provider salary and call pay because the contract did not require AMS to provide back-up documentation (such as invoices for fringe benefits, physician employment contracts, and call schedules) that would have been necessary to assess the accuracy and validity of such costs.  Once Relator had reviewed and signed, the approved invoices were forwarded to HCCS who would wire payment to the medical schools.

104.    HCCS also generates annual reports of the amount and cost of under-compensated and uncompensated care its private hospitals provided to poor and uninsured patients (hereafter "indigent care" reports).  Those reports were sent to Relator's group at HCHD/HHS.  The reports were *supposed* to be given to the HCHD/HHS's Vice President and CFO, Mike Norby, who would then make a "voluntary" yearly IGT to the state based on the amount of indigent care documented in the report.  As a result, Texas made supplemental Medicaid payments (most of which the federal government reimbursed through its FFP) to the private hospitals, but HCHD/HHS and the medical schools ultimately would reap the greater share of those benefits.

105.    However, while such reports were supposed to be given to Mr. Norby, Relator never witnessed Mr. Norby looking at the indigent care reports during his time at HCHD/HHS, nor does Relator believe Mr. Norby ever actually received a copy of the reports. The reports were transmitted from HCCS to HCHD/HHS via a CD, and the transmittal email sent by HCCS instructed all parties to contact Beth Cloyd, and later Relator, if they wanted to access the reports.  When Relator began working at HHS, he asked Ms. Cloyd what to do with the annual reports after he, as point person, started receiving them rather than Ms. Cloyd.  She said she put them into a drawer and noted that no one ever saw or asked about them.  She advised Relator to do the same.  At the time of his termination, four years of reports were in Relator's file cabinet.

106.    During his time at HHS, Relator and Ms. Cloyd were the only people to Relator's knowledge who ever saw the annual reports.  Relator understood that the Finance Department, which determined the IGT amounts, calculated them to maximize the federal matching payments within the confines of cash available for IGT.  The private hospitals' donations of their

providers' services—and the increased supplemental Medicaid payments they received in return—were integral to this scheme because HHS's IGT would have been financially impossible without those donations.

107.    Toward the end of Relator's tenure at HCHD/HHS, Terry Reeves, COO, told Relator that Mr. Reeves' department was responsible for making the IGT calculations.  Relator did not understand how this was possible because Mr. Reeves did not have access to the indigent care report.  Furthermore, to Relator's knowledge Mr. Reeves's department did not routinely engage in the accounting or financial calculations necessary to calculate the IGT or have any familiarity with HCHD/HHS cash flows and budgets.

108.    Through his training, job duties, and interactions with others at HCHD/HHS and the Defendant entities, Relator came to understand that the purpose of the Harris Collaborative program was for HCHD/HHS to receive physician and other provider services from the medical schools, paid for by the private hospitals, in exchange for HCHD/HHS's making IGTs that resulted in Medicaid supplemental payments to the private hospitals that exceeded the value of the donated physician and other provider services.

109.    The causal relationship between HCCS's donation, HCHD/HHS's IGT to the state, and the resulting supplemental payments that flowed to the affiliated hospitals was apparent to those involved in the program.

110.    For example, during the initial base contract negotiations in 2007 and 2008, the medical schools and AMS kept pushing for increased payment from HCCS.  AMS and the medical schools sought "additional support payments" for professional expenses and activities and graduate medical education programs and administrative costs.

111.    It was common knowledge among HCHD/HHS executives and board members that the additional support payments were the last of a long list of demands for funding made by AMS during negotiations with Ms. Cloyd and others.  David Lopez, HCHD's CEO at the time, decided that the schools had demanded enough already and told AMS that if AMS included these additional support payments on the invoices it sent to HCCS—which HCHD/HHS approved

{00075797; 1 }                                                    33

before payment by HCCS—then HCHD/HHS would not approve those invoices.

112.    In order to appease AMS and the medical schools, which threatened to withdraw from the agreement if the payments were not made, HCCS agreed to make the additional support payments separately.  To accomplish this, the amounts for these payments (several million per year) were deducted from the IGT amount submitted by HCHD/HHS on behalf of HCCS each year.  That way, HCCS did not receive the amount of supplemental Medicaid payments that would have resulted from that additional amount being included in the IGT.  Instead, HCCS paid the amount of these additional support payments directly to AMS.

113.    During AMS committee meetings attended by Relator, both Mr. Lopez and Mr. Norby assured HCHD/HHS board members that the additional support payments that would otherwise be included by Mr. Norby for the benefit of HCCS hospitals, are subtracted from the IGT amount so that HCCS, rather than HCHD/HHS, is funding the payments.

114.    The fact that HHS and HCCS deducted these additional support payments from the IGT amount made on behalf of HCCS demonstrates that HCHD/HHS's IGTs were not actually based on a voluntary contribution independently determined by HCHD/HHS based on the annual report on indigent and uninsured care provided by the private hospitals.  Instead, the exclusion of these payments made by HCCS to AMS shows how clearly the payments made by HCCS correlated to the IGT amount, which was reduced by the amount of these payments.  This demonstrates that the "donations" HCCS made were, in reality, merely an exchange made in order for the private hospitals to receive supplemental Medicaid funds.

115.    In addition, in July 2011, Relator prepared a slideshow for HCHD/HHS CEO David Lopez and Board Members on the AMS-HCCS contract. Ex. 2.  Dated June 30, 2011, the slideshow demonstrates that HCCS (and, by extension, the medical schools HCCS paid) expected to receive money because of the IGT from HCHD/HHS to the State, which would generate supplemental payments.

116.    The slideshow addressed the abysmal collection rates of the medical schools, which shows the correlation between the IGT and the return of funds through supplemental

payments.  Under the AMS-HCCS contract, BCM and UTHealth were responsible for collecting any revenue from insured or paying patients at HCHD/HHS, and these funds were supposed to be used to offset HCCS's payments to AMS for physician and other provider services.  That is, HCCS was supposed to be able to reduce its payment to the schools by the amount of revenue the schools collected from insured and paying patients.  However, because the medical schools were paid regardless of whether the funds came from collections or from HCCS, they had little incentive to maximize collections.  In fact, collections from insured patients were often lower than the amount HCCS would pay the private hospitals. Thus, perversely, the private hospitals were incentivized <u>not</u> to pursue insurance collections.

117.    The slideshow suggested that one option to improve this problem would be for HCHD/HHS to "Reduce IGT payments equal to collection deficits." (*See* last slide.)  In other words, if BCM and UTHealth did not collect enough patient payments, HCHD/HHS would correspondingly lower the IGT payments it made to the state.  This, in turn, would de-incentivize the schools to achieve a higher collection rate because a smaller IGT would result in smaller supplemental Medicaid payments to the private hospitals, and the less money the private hospitals received in supplemental Medicaid payments, the less money they had to funnel to the medical schools through AMS.  The logic underlying this proposal confirms the corresponding link between HCCS, AMS, the donation, and the payments.  If HCCS had no expectation that its "donations" to HCHD/HHS would be returned in the form of increased Medicaid payments, there would be no reason for HCHD/HHS to use the IGT amount as a means of pressure.

118.    In addition, the slide noted that reducing the IGT payments by the corresponding amount of collection deficits would make HCHD/HHS "Good stewards of taxpayers' money," by incentivizing the medical schools to cover more of the cost of indigent and uninsured care through collections, instead of relying on taxpayer dollars received as a result of the contract with HCCS.  This observation further confirms that HCHD/HHS was well aware that using supplemental Medicaid payments to pay the medical schools was not the intended use of taxpayers' money.  HCHD/HHS understood that the funds at issue should have been used to pay

for indigent and uninsured care instead of padding the medical schools' coffers, especially since the medical schools were intentionally careless about their collection practices.  The slide also noted that lowering the IGT would have the impact of straining the medical school and HCCS partnerships.  If the donations were truly bona fide and not conditioned on this exchange, the amount of IGTs should have no impact on the partnership.

119.     In 2010, when Relator first began working at HCHD/HHS, he drew a flow chart of the entities involved and the exchange of funds among them, in an attempt to better understand the contracts and relationships in the Harris Collaborative program:  *See* Ex. 3 (Relator's hand drawn chart) and below (digital re-creation of chart originally drawn by Relator in 2010).  The chart showed that HCHD/HHS made an IGT to the state, and the state then transferred this amount of money multiplied by the Federal Medical Assistance Percentage rate to HCCS.  HCCS then paid AMS from these funds received as supplemental Medicaid payments.



120.     To understand where he was missing information in the chart, in early 2011,

Relator showed the chart to Mr. Norby.  Mr. Norby told Relator the chart looked accurate, but that he should erase the arrow showing HCHD/HHS's IGT to the state on behalf of HCCS because there was a "firewall" between HCHD/HHS and HCCS to make it appear that HCHD/HHS did not make the IGT based on the amount of HCCS's donation, but rather to create the impression that HCHD/HHS voluntarily donated an amount based on the annual indigent care report HCCS provided.  Mr. Norby insisted that Relator not show the chart to anyone or discuss it.

121.    In this same conversation, Mr. Norby also told Relator that, before HCHD/HHS's agreement with HCCS, HCHD/HHS never had enough cash on hand to transfer via IGT to hit the UPL cap on supplemental funds returned.  The private affiliated hospitals did have enough money, but the cap on the amount of supplemental payments they could receive was lower than that of the public hospitals.  Mr. Norby explained that the agreement was engineered to free up more money to allow HCHD/HHS to make a greater IGT to the state and generate greater Medicaid funds, the excess of which could then be transferred to the private affiliated hospitals.

122.    Mr. Norby's explanation of the so-called "firewall" that HCHD/HHS attempted to use to give the appearance that the donations were unrelated to the supplemental payments is reflected in HCHD/HHS's policy concerning Upper Payment Limit Program Compliance.

123.    Through this policy, HCHD/HHS attempted to make its participation in the scheme seem legitimate by appearing to shield Executives from the details of the arrangement. HCHD/HHS's Policy 3.45, Upper Payment Limit Program Compliance Policy section II.C.2, specified that "the invoices, supporting statements, reconciliation, and summary shall not be provided to the President/Chief Executive Officer or Chief Financial Officer of the Harris County Hospital District or anyone else involved in calculating the transfer of funds on behalf of the Collaborative Members except as specifically provided in Section II.C.3."  This policy to create the false impression that Executives at HCHD/HHS were not aware that HCHD/HHS received invoices and cost reports from HCCS and therefore, also to falsely suggest that those documents could not properly be tied to the amount of money that HCHD/HHS transferred to the

state.

124.    Although this policy was designed to create the false impression that Senior

Executives at HCHD/HHS were walled off from knowing all the details, Section II.C.3

demonstrates that Executives, in fact, knew full well the role HCCS played in donating services.

Section II.C.3 states: "On a quarterly basis, the Program Manager for Financial Analysis may

prepare a summary of services provided by HCCS through AMS and submit such information to

the President/Chief Executive Officer and/or Chief Financial Officer of HCHD as part of the

quarterly report as described in Section II.D below."

125.    HCHD/HHS also budgeted the IGT amounts quarterly, which it would have been

unable to do without the assurance that services would be donated and the understanding that

HCCS would continue to make the donations, and continue to receive a corresponding amount of

supplemental payments quarterly.  In addition, HCHD/HHS factored the value of the donations

into its finances by recording the cost of physicians' services in its financial records as an

expense—even though HCCS actually pays for the physician services.

126.    HCHD/HHS's own financial statements underscore the link between the HCCS-

AMS agreement and HCHD/HHS's increased IGT of funds to the state:  HCHD/HHS's 2014-

2015 Financial Statements state that HCCS provides approximately $243 million worth of

services per year to Harris County, and that during 2014 and 2015, HCHD/HHS utilized $196.3

million and $158.2 million of tax revenues, respectively, as the nonfederal share of the Harris

Collaborative program (the amount IGT'd to the state Medicaid agency).  HCHD/HHS recorded

expenses of $177.0 million and $188.0 million in 2014 and 2015, respectively, under the Harris

Collaborative program and provider affiliation agreements.  These expenses are reflected as

physician services in the statements of revenues, expenses, and changes in net position.

127.    Indigent care agreements are also prohibited hold harmless agreements when they

relieve the governmental entity from its legal obligation to pay for indigent care services, which

is an in-kind exchange of value between the county and the private hospitals.  In Texas, counties

are ultimately responsible for providing indigent medical care.  Texas Health and Safety Code

§ 61.033 identifies the county as liable as payor of last resort for indigent care.

128.     CMS has indicated that affiliation agreements to provide indigent care without direct reimbursement by the responsible governmental unit relieve the government of this legal obligation, and absent such an affiliation agreement, the county would have to use local funds for indigent care.  CMS views this as a prohibited "hold harmless" arrangement and explained in its May 9, 2014 letter to State Medicaid Directors that "[a]ny arrangement…that obligate[s] a private hospital to either assume the programmatic responsibility of a unit of government…would be considered a hold harmless arrangement."  CMS, Guidance Letter RE: Accountability #2: Financing and Donations, SMD 14-004 (May 9, 2014).

129.     That is exactly what HCHD/HHS, HCCS, the affiliated hospitals, AMS, and the medical schools did.  Before entering the HCCS-AMS contract, HCHD/HHS paid AMS directly for physicians, medical directors, and other healthcare providers.  Upon entering the contract, HCHD/HHS turned over this responsibility to HCCS and AMS, which assumed responsibility for providers at the county hospitals and medical facilities.

**B.     Payments Made to the Medical Schools with Supplemental Medicaid Payments Exceeded FMV, Diverted Funding Away From Indigent And Uninsured Care, and Were Not Consistent With Economy, Efficiency, and Quality of Care**

130.     The purpose of Texas's supplemental Medicaid payments is to provide private hospitals and providers expending resources on indigent and uninsured care with greater financial assistance to provide this care.  Supplemental Medicaid payments are required to be expended on providing increased benefits to Medicaid patients.  *See* 1 Tex. Admin. Code § 355.8201(b)(24) (defining uncompensated care payments as: "Payments intended to defray the uncompensated costs of services that meet the definition of 'medical assistance' contained in § 1905(a) of the Social Security Act that are provided by the hospital to eligible or uninsured individuals").  Furthermore, the Social Security Act "requires that [supplemental Medicaid] payments for services be consistent with efficiency, economy, and quality of care."  42 C.F.R. § 447.200.

131.     But when HCCS, through its affiliated private hospitals, received supplemental

payments, HCCS diverted much of this money—approximately $50 million or more per year—away from indigent and uninsured care by using the funds instead to pay AMS exorbitant costs—approximately $50 million or more per year above FMV—for providers' services.

132.    Physician and other provider compensation and medical directorships were the core of the HCCS-AMS contract, which generated increased supplemental Medicaid payments that were then used to pay the unnecessarily high costs AMS charged for these services under the contract.  In doing so, Defendants cheated patients out of the benefits of increased funding for indigent and uninsured care that supplemental Medicaid payments were supposed to provide. The increased payments did not correspond to an increase in the quality of care or providers, or have any other benefit for patients.

133.    AMS charged, and HCCS paid, far more than FMV for provider services under the AMS-HCCS contract.  The annual cost of physician and other provider services charged by AMS was approximately $250 million by around 2015.  Of that yearly cost, between 2009 and 2016, Relator estimates that $50-60 million dollars per year was due to providers' salaries and other compensation that were over FMV.

134.    The compensation costs charged by AMS for physician services consist of salary, fringe benefits, call pay, fringes on call pay, and an overhead calculated as 18% of salary and fringe benefits, less payments received by AMS from their billing for physician services. Including overhead as a component of physician (and other provider, such as nurse practitioner) compensation is highly unusual.  Typically, the cost of overhead is already factored into physician compensation for services.  Likewise, fringes being added on top of call pay is highly unusual, as payment for call, in national surveys, is commonly an all-inclusive flat rate.

135.    On top of the unusual compensation cost components discussed above, AMS is also paid a monthly production bonus, by department, averaging 10.7% of the total annual compensation invoiced to HCCS by AMS.  The bonus is calculated by measuring AMS physician production, in terms of Relative Value Units ("RVUs"), compared to 15% above and 15% below a rolling average base line. This range between 15% above and below the baseline is

referred to as the "risk corridor."  The base line is determined by AMS as the average of the most current three years' median RVU production of all other academic physicians as reported in nationwide surveys by the Medical Group Management Association ("MGMA") Academic Compensation Surveys (the leading source of FMV data on providers in academic practices).

136.     Each physician provider's RVU production is measured against the baseline.  If, for example, a cardiologist produced RVUs at the baseline for the month, the salary charged by AMS for the cardiologist that month would remain the same.  However, if the cardiologist produced RVUs that exceeded the baseline by 15%, AMS would charge HCCS up to 15% additional salary that month. The opposite holds true if the cardiologist produced less than the median; AMS would charge up to 15% less salary.  However, since AMS charges for bonuses by department, if excess RVUs over the top of the risk corridor are produced by other physicians, or other non-physician providers, there is no reduction of salary for the cardiologist.  Although there are no national surveys applicable, the RVUs produced by non-physician providers, such as nurse practitioners and certified registered nurse anesthetists, are credited to their respective departments.  AMS assigns an arbitrary baseline for bonus calculations for non-physician providers.  However, Relator's understanding is that the medical schools do not actually pay bonuses to providers other than physicians, even though AMS invoices HCCS for bonuses for all providers, physicians and non-physicians alike.

137.     In calculating the dollars charged for bonuses for each department, AMS charges for each RVU based on the 2008 Medicaid and Medicare reimbursement rates, as applicable. Even though both rates have fallen since 2008, AMS does not reduce their charges for bonuses to reflect these reductions.  During every year Relator was employed, with minor exceptions, all departments were paid the maximum bonuses made available by their respective risk corridor calculations, meaning no less than an extra 15% of salaries charged were added.

138.     In particular, the cost of medical directorships under the AMS-HCCS contract greatly exceeded FMV.  In 2010, Relator compared the compensation for medical directors under the contract to the MGMA survey compensation and found that the compensation paid for

medical directors under the contract exceeded every table in the MGMA survey.  In comparison to the multi-specialty MGMA table, the contract's payments exceeded FMV by hundreds of millions of dollars since the contract began in 2008.

139.    Throughout the history of these arrangements, HCCS, AMS, the affiliated hospitals, BCM, BaylorMedCare, UTHealth, and UT Physicians have all been aware that the cost of physicians' and other providers' salaries under the collaborative program have at all times been greater than FMV, and that the supplemental Medicaid payments ultimately paid for them. HCCS would never have been able to pay the salary costs to BCM and UTHealth without relying on receipt of the supplemental payments.

140.    By charging over FMV for providers' services under the Collaborative Program, each co-conspirator receives something from the deal.  HCCS's affiliated private hospitals receive increased supplemental Medicaid payments, which at all times have been more than enough to cover the cost of paying AMS and the medical schools.  AMS and the medical schools receive excessive payment from HCCS for their providers.  Under these arrangements, BaylorMedCare and UT Physicians providers have at all times been required to work only minimal hours to meet their productivity goals under the AMS-HCCS contract with the private hospitals, leaving them ample time to generate revenue for their private practices.  Harris County facilities such as Quentin Mease Community Hospital, Lyndon B. Johnson Hospital, and Ben Taub Hospital likewise have at all times benefitted from the unlawful arrangement by no longer having to pay for physicians, thus saving money.

141.    Relator's understanding is that the actual providers do not receive the salary amounts that AMS charges to HCCS for providers' work.  The payments AMS received for providers' work are instead transferred to the medical schools, which paid physicians and other providers a lower rate than it charged HCCS for their work.  Ms. Cloyd told Relator that several times physicians asked her what AMS charged for their services, because they had heard that AMS charged more for their services than they were paid.  BCM and UTHealth, and/or BaylorMedCare and UT Physicians, retained the excess funds.

142.    Ms. Cloyd (or possibly her assistant) gave Relator what she told Relator were identical copies of the HCCS-AMS contract when Relator began working at HCHD/HHS; one a Word version, and the other a PDF.  The Word version, which was an unexecuted copy, contained a clause providing for a FMV appraisal of physicians' and other providers' compensation.  Relator asked to see this appraisal, but was not given a copy.

143.    In 2012, he was tasked with preparing a contract directly between HCHD/HHS and AMS that was essentially a copy of the HCCS-AMS contract.  He did so, utilizing the Word version, so the new contract contained an identical FMV clause.  However, Mr. Norby thwarted Relator's efforts to hire an appraisal firm for the new contract.  Later, Relator found that, unlike in the Word version, in the executed PDF version the provision requiring that a FMV analysis be performed was eliminated.

144.    Shortly before Relator was terminated from HCHD/HHS, he managed to obtain the appraisal that had supposedly been performed after the HCCS-AMS contract was executed.  However, he discovered that this "appraisal" was not in fact an appraisal of FMV at all.  Rather, only an audit of whether invoices and billing flowed correctly was conducted.  That audit did not assess whether the compensation for physician services was at FMV.

145.    Throughout his tenure at HCHD/HHS, Relator repeatedly warned many of the key actors identified herein that HCCS and AMS contracted for physicians' and other providers' services at rates far above FMV.

146.    For example, on June 23, 2011, Relator sent an email about an upcoming meeting to numerous employees of UTHealth, BCM, and to Ms. Cloyd.  The email summarized *United States ex. rel. Kaczmarczyk v. SCCI Hospital Ventures*, No. H-99-1031 (S.D. Tex.), a case concerning the FMV and commercial reasonableness of medical directors' compensation, which Relator indicated was relevant for the upcoming meeting.  At that meeting, Relator reviewed a proposed medical directorship program that would bring medical directorships into compliance by being at FMV, and reduce the number of medical directors as there was an unnecessary number of medical directorships at the time.  Revisions and discussion over changes to the

medical directorship program continued for years with little progress, as AMS strongly opposed any changes that would result in less lucrative payment for its doctors.

147.    Soon thereafter, Relator prepared the slideshow referred to above for the HCHD/HHS CEO and Board Members on the AMS-HCCS contract.  *See* Ex.2.  Dated June 30, 2011, the slideshow lists "Issues with the Current Contract," including medical directors' compensation.  The slideshow further notes that while medical directors' compensation is "typically paid according to local or national survey data, as indicators of FMV" and that it "must be at FMV for time of physician," Relator could find "no similar methodology in Houston market; none found nationally" to support AMS medical directors' compensation.

148.    In another incident on July 26, 2011, Relator emailed Ms. Cloyd and Mr. Norby about Medical Directorships and whether HCHD/HHS should be paying medical directors themselves, instead of through the HCCS-AMS contract.  However, despite the fact that Relator's proposed solution would eliminate a number of these concerns, HCHD/HHS continued to receive the services as a donation.

149.    In 2014, Allen Isaacson, a Systems Architect at HCHD/HHS, prepared a report titled "Harris Health System – All Practices Fiscal Year 2013, Establishment of Baseline Benchmarks, AMS Invoiced Cost and Production (RVUs) per MGMA," comparing the actual payments HCCS made during fiscal year 2013 to the medical schools with what it would have paid to the medical schools had HCCS reimbursed the schools using salaries at FMV, based on MGMA academic salary data.

150.    For the specialty with the greatest difference between actual payments and FMV, anesthesiology, the difference between actual pay and FMV was $3,300,000 for BCM physicians in fiscal year 2013.  The second largest discrepancy was in Family Medicine doctors at BCM, for whose services BCM received $3,200,000 over FMV in fiscal year 2013.  In total, the report revealed that tens of millions of dollars were being expended over FMV.

151.    The cost of the physicians was so high that Mr. Norby told Relator that within two years the arrangement would no longer be profitable for the private hospitals.  At that point, the

amount of payments the private hospitals would have to make to the medical schools would be less than the amount of supplemental payments they received.

152.     The degree to which HCCS made payments that exceeded FMV concerned Relator greatly.  Relator sent the report to AMS executives, senior management at Harris County Hospital District hospitals, the Board of Managers of Harris Health System, and Harris County Commissioners.  Relator also sent the report to HCHD/HHS's Compliance Department, which claimed that payments to the medical schools fell outside the scope of HCHD/HHS's control, even though HCHD/HHS had negotiated the payments with the medical schools and HCCS, and HCHD/HHS administered the contract between HCCS and AMS.  He received no responses.

153.     When Ms. Cloyd left HCHD/HHS, Relator brought his concerns about the FMV of those payments for physician services by HCCS to AMS to the attention of George Masi, his new boss, who later became the CEO of HCHD/HHS, succeeding David Lopez.  Relator stressed that an outside audit was permissible under the contract and strongly recommended one be performed.  Although Mr. Masi initially agreed to hire an outside audit firm, he ultimately sent a person from his staff who had audit experience to jointly "audit" the salaries, fringes and other costs included in AMS invoices, with a representative of each school.  The supposed "audit" consisted of no written report, but only oral feedback that "everything was okay."  This oral feedback avoided completely the question of whether those payments were at FMV.

154.     As part of Relator's position, he approved AMS invoices on behalf of Executive Managers: first Ms. Cloyd, then Mr. Masi, and then Mr. Norby.  But after Relator's team was transferred to the Finance department, he was instructed to no longer sign on behalf of Mr. Norby and to sign them in his own name instead.

155.     Relator was uncomfortable that his duties now included signing approvals for the monthly invoices AMS sent HCHD/HHS, which he knew were far above FMV.  In August 2015, Relator addressed his concerns about this and other issues.  Instead of dealing with the problem of physician pay and the other issues Relator raised, HCHD/HHS terminated him.

156.     Through the acts described above, since at least July 2008 Defendants have

knowingly made, used, and caused to be made and used false records and statements material to false or fraudulent claims for federal matching funds for UPL supplemental Medicaid payments or, in the alternative, knowingly made, used, and caused to be made and used false records and statements to get paid and approved false or fraudulent claims for federal matching funds from UPL supplemental Medicaid payments.

157.    Through the acts described above, each federal fiscal quarter since at least July 2008, Defendants have caused the State of Texas to submit CMS Form 64 and statements of state Medicaid spending that, because they included amounts funded by Defendants' non-bona fide donations, are inaccurate as to the proper amount of such spending entitled to FFP payments.

158.    As a result of these prohibited acts, the United States and the state of Texas have been damaged and continues to be damaged, in an amount that cannot yet be finally determined, but which amounts to more than two hundred million dollars.

## VIII.   CAUSES OF ACTION

### COUNT I
### False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

159.    Relator realleges and incorporates by reference the allegations contained in all paragraphs 1 – 158 above as if fully set forth herein.

160.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-33, as amended.

161.    By virtue of the acts described above, all Defendants—and other co-conspirators identified herein but not named as defendants in this action—knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval.

162.    The United States, unaware of the falsity of the claims made or caused to be made by Defendants, has paid such false or fraudulent claims that would not have been paid but for Defendants' illegal conduct.

163.    By reason of Defendants' and their co-conspirators' acts, the United States has

been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

164.    Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

## COUNT II
## False Claims Act
## 31 U.S.C. § 3729(a)(1)(B)

165.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 164 above as though fully set forth herein.

166.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-33, as amended.

167.    By virtue of the acts described above, all Defendants—and other co-conspirators identified herein but not named as defendants in this action—knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims.

168.    By reason of Defendants' and their co-conspirators' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

169.    Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

## COUNT III
## False Claims Act
## 31 U.S.C. § 3729(a)(1)(C)

170.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 169 above as though fully set forth herein.

171.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-33, as amended.

172.    By virtue of the acts described above, all Defendants—and other co-conspirators identified herein but not named as defendants in this action—knowingly conspired to commit

violations of 31 U.S.C. § 3729(a)(1)(A), (B), and (G), in violation of 31 U.S.C. § 3729(a)(1)(C), and took multiple steps individually and collectively to advance and execute the objectives of that conspiracy.

173.    Unaware of the conspiracy or the steps each Defendant took individually or collective to advance and execute the conspiracy, the United States has relied on such false records and statements to pay and approve false or fraudulent claims that would not have been paid or approved but for Defendants' illegal conduct.

174.    By reason of Defendants' and their co-conspirators' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

175.    Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

## COUNT IV
## False Claims Act
## 31 U.S.C. § 3729(a)(1)(G)

176.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 175 above as though fully set forth herein.

177.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-33, as amended.

178.    By virtue of the acts described above, all Defendants and other co-conspirators identified herein but not named as defendants in this action knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

179.    Unaware of Defendants' and their co-conspirators' misconduct, the Government did not collect from the Defendants all the money it would have collected but for the Defendants' illegal conduct.

180.    By reason of Defendants' and their co-conspirators' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

181.     Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

### COUNT V
### Texas Medicaid Fraud Prevention Act
### Tex. Hum. Res. Code Ann. § 36.002(1)

182.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 181 above as though fully set forth herein.

183.     This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. §§ 36.001, *et seq*.

184.     By and through the acts described above, all Defendants—and other co-conspirators identified herein but not named as defendants in this action—have knowingly made or caused to be made false statements or misrepresentations of material facts to permit them to receive payments from the Texas Medicaid program that were not authorized or that were greater than the payments that were authorized.

185.     The State of Texas, unaware of the falsity of all such claims and statements material to payments made, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

186.     By reason of Defendants' and their co-conspirators' acts, the State of Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

187.     Additionally, the State of Texas is entitled to the maximum penalty of up to $10,000 for each and every violation alleged herein, and up to $15,000 per violation if the violation results in harm to an elderly person.

### COUNT VI
### Texas Medicaid Fraud Prevention Act
### Tex. Hum. Res. Code Ann. § 36.002(2)

188.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 187 above as though fully set forth herein.

189.     This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. §§ 36.001, *et seq.*

190.     By and through the acts described above, all Defendants—and other co-conspirators identified herein but not named as defendants in this action—have knowingly concealed or failed to disclose information, thus permitting them to receive payments from the Texas Medicaid program that were not authorized or that were greater than the payments that were authorized.

191.     The State of Texas, unaware of such concealment or failure to disclose, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

192.     By reason of Defendants' and their co-conspirators' acts, the State of Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

193.     Additionally, the State of Texas is entitled to the maximum penalty of up to $10,000 for each and every violation alleged herein, and up to $15,000 per violation if the violation results in harm to an elderly person.

<u>**COUNT VII**</u>
<u>**Texas Medicaid Fraud Prevention Act**</u>
<u>**Tex. Hum. Res. Code Ann. § 36.002(4)**</u>

194.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 193 above as though fully set forth herein.

195.     This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. §§ 36.001, *et seq.*

196.     By and through the acts described above, Defendants—and other co-conspirators identified herein but not named as defendants in this action—knowingly made, caused to be

made, induced, or sought to induce the making of false statements or misrepresentations of material facts concerning information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program.

197.    The State of Texas, unaware of the falsity of all such statements and misrepresentations of material facts, has paid and continues to pay false or fraudulent claims that would not be paid but for Defendants' and their co-conspirators' illegal conduct.

198.    By reason of Defendants' and their co-conspirators' acts, the State of Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

199.    Additionally, the State of Texas is entitled to the maximum penalty of up to $10,000 for each and every violation alleged herein, and up to $15,000 per violation if the violation results in harm to an elderly person.

**COUNT VIII**
**Texas Medicaid Fraud Prevention Act**
**Tex. Hum. Res. Code Ann. § 36.002(5)**

200.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 199 above as though fully set forth herein.

201.    This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. §§ 36.001, *et seq.*

202.    By and through the acts described above, Defendants and their co-conspirators have knowingly paid, charged, solicited, accepted, or received, in addition to amounts paid under the Medicaid program, gifts, money, donations, or other consideration as a condition to the provision of services or the continued provision of services if the cost of the service is paid for, in whole or in part, under the Medicaid program.

203.    The State of Texas, unaware of such payments or other consideration, has paid and continues to pay false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

204.     By reason of Defendants' and their co-conspirators' acts, the State of Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

205.     Additionally, the State of Texas is entitled to the maximum penalty of up to $10,000 for each and every violation alleged herein, and up to $15,000 per violation if the violation results in harm to an elderly person.

### COUNT IX
### Texas Medicaid Fraud Prevention Act
### Tex. Hum. Res. Code Ann. § 36.002(9)

206.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 205 above as though fully set forth herein.

207.     This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. §§ 36.001, *et seq*.

208.     By and through the acts described above, Defendants and their non-defendant co-conspirators' have conspired to commit violations of Tex. Hum. Res. Code Ann. § 36.002(1), (2), (4), (5), and (12).

209.     The State of Texas, unaware of such violations, has paid and continues to pay false or fraudulent claims that would not be paid but for Defendants' and their co-conspirators' illegal conduct.

210.     By reason of Defendants' and their co-conspirators' acts, the State of Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

211.     Additionally, the State of Texas is entitled to the maximum penalty of up to $10,000 for each and every violation alleged herein, and up to $15,000 per violation if the violation results in harm to an elderly person.

### COUNT X
### Texas Medicaid Fraud Prevention Act
### Tex. Hum. Res. Code Ann. § 36.002(12)

212.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 211 above as though fully set forth herein.

213.     This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. §§ 36.001, *et seq*.

214.     By and through the acts described above, Defendants and their co-conspirators' have knowingly made, used, or caused the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under the Medicaid program, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the State of Texas under the Medicaid program.

215.     The State of Texas did not collect from the Defendants and their co-conspirators all the money it would have collected but for the Defendants' illegal conduct.

216.     By reason of Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

217.     Additionally, the State of Texas is entitled to the maximum penalty of up to $10,000 for each and every violation alleged herein, and up to $15,000 per violation if the violation results in harm to an elderly person.

## PRAYER

WHEREFORE, Relator Kent Vaughn prays for judgment against Defendants as follows:

218.     That Defendants cease and desist from violating 31 U.S.C. §§ 3729 - 3733;

219.     That Defendants cease and desist from violating Tex. Hum. Res. Code Ann. §§ 36.001, *et seq.*;

220.     That, to the extent the United States and/or the State of Texas collect(s) ill-gotten federal or state funds that stem from the allegations alleged in this action from non-party UTHealth and/or the State of Texas or any other State entity, this Court consider such recovery an alternate remedy under 31 U.S.C. § 3730(c)(5) and Tex. Hum. Res. Code § 36.109.

221.     That this Court enter judgment jointly and severally against each of the Defendants in an amount equal to three times the amount of damages the United States and the State of Texas have sustained because of Defendants' and their co-conspirators' actions, plus the maximum civil penalty permitted for each violation of the Federal False Claims Act or of the Texas Medicaid Fraud Prevention Act;

222.     That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the Federal False Claims Act and § 36.110 of the Texas Medicaid Fraud Prevention Act;

223.     That Relator be awarded all costs of this action, including all recoverable attorneys' fees and expenses; and

224.     That the United States, the State of Texas, and Relator recover such other and further relief as the Court deems just and proper.

## IX.     **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator Kent Vaughn hereby demands a trial by jury.


Dated:  August 31, 2017

_____
Mitchell R. Kreindler
S.D. Texas Bar No. 32980
mkreindler@blowthewhistle.com
KREINDLER & ASSOCIATES
9219 Katy Freeway, Suite 206
Houston, TX 77024
Tel: (713) 647-8888
Fax: (713) 647-8889

Peter Chatfield
pchatfield@phillipsandcohen.com
John Tremblay
jtremblay@phillipsandcohen.com
PHILLIPS & COHEN LLP
2000 Massachusetts Avenue, NW
Washington, DC 20036
Tel: (202) 833-4567

Fax: (202) 833-1815
(Pro Hac Vice Motions to be Filed)


Emily Stabile
estabile@phillipsandcohen.com
PHILLIPS & COHEN LLP
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Tel: (415) 836-9000
Fax: (415) 836-9001
(Pro Hac Vice Motion to be Filed)


*Attorneys for Relator*
Kent Vaughn