United States District Court
Southern District of Texas
**ENTERED**
August 04, 2021
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| KENT VAUGHN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:17-CV-2749 |
| | § | |
| HARRIS COUNTY HOSPITAL | § | |
| DISTRICT, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND RECOMMENDATION

This is a *qui tam* action brought by Relator on behalf of the United States under the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"), alleging generally that Defendants—who are various medical schools and public and private hospitals in Harris County, Texas—engaged in a scheme to defraud the United States Government in relation to its share of Medicaid expenses. (Dkt. No. 29.) Pending before the Court[1] are several motions: Defendants' Joint Motion to Dismiss, which primarily asserts that Relator's claims fail under the public disclosure bar (Dkt. No. 121), and five separate Motions to Dismiss, which assert additional grounds for dismissal as to each Defendant (Dkt. Nos. 122, 124–127).[2] Based on a thorough review of the motions, arguments, and relevant law, the Court **RECOMMENDS** the Joint Motion to Dismiss be **GRANTED IN PART** and **DENIED IN PART WITHOUT PREJUDICE** and the separate Motions to Dismiss be **DENIED AS MOOT**.

---

[1] This case was referred to the Undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. (Dkt. No. 145.)

[2] Defendant Harris County Hospital District filed an additional Motion to Dismiss. (Dkt. No. 123.) The Court addresses this motion in a separate Memorandum and Recommendation.

I.      BACKGROUND

    A.      Factual Background

Relator Kent Vaughn ("Relator") is a former employee of Defendant Harris County Hospital District ("Hospital District"), the public hospital system that provides care for indigent and non-indigent patients in Harris County, Texas. (Dkt. No. 29 ¶¶ 25, 36.) Relator worked as the Associate Administrator for Provider Practices and Contracting from 2010 until he was fired in February 2016, allegedly for attempting to bring the scheme described in his complaint to light. (*Id.* ¶ 25.) In his position at Hospital District, Relator oversaw contracts between Hospital District and various other medical entities, including Defendant Harris County Clinical Services ("Clinical Services") and Defendant Affiliated Medical Services ("Medical Schools"). (*Id.*) Clinical Services is a non-profit umbrella organization composed of private hospitals in Harris County. (*Id.* ¶ 26.) Medical Schools is a non-profit health system organization composed of Baylor College of Medicine and UT Health Science Center. (*Id.* ¶ 43.)[3]

Relator alleges that, during his employment, he uncovered a scheme between Hospital District and its affiliates ("Public Hospitals"), Clinical Services and its affiliates ("Private Hospitals"), and Medical Schools to evade Medicaid cost-sharing between local, state, and federal governments and divert excessive Medicaid funds for their own financial benefits. (Dkt. No. 29 ¶¶ 5, 9–10.) Relator alleges the scheme—which the Court refers to as the "Program"—began when Private Hospitals and Medical Schools entered into a contract on July 1, 2008. (*Id.* ¶ 100.) Under this contract, Private Hospitals would pay Medical Schools an above-market rate to staff Public

---

    [3] Relator also named various affiliates of Hospital District, Clinical Services, and Medical Services as defendants in the case. (Dkt. No. 29 ¶¶ 26–43.) Relator voluntarily dismissed claims against several of these defendants. (Dkt. No. 129.)

Hospitals at no cost to the Public Hospitals, making it appear Private Hospitals had made donations for indigent care. (*Id.* ¶¶ 7, 110.)[4] Public Hospitals then used the savings generated by not paying its own medical staff to fund intergovernmental transfers ("Transfers") to Texas, which in turn used the money to pay its share of Medicaid funds to the Centers for Medicare and Medicaid Services ("CMS") at the federal level. (*Id.* ¶¶ 4, 65.) CMS then matched[5] Texas's contributions—up to the upper payment limit[6]—and the sum was eventually paid to Private Hospitals at a substantial profit. (*Id.* ¶¶ 7–11.)

Relator believes the Program was a *quid pro quo* arrangement that violated the laws and regulations governing Medicaid. (Dkt. No. 29 ¶ 103.) While Relator acknowledges Medicaid allows for bona fide donations from private to public hospitals to defray the cost of indigent care, he alleges the donations in this case were short-term investments meant to benefit everyone but the federal government. (*Id.* ¶¶ 9–11, 103.) Private Hospitals received more Medicaid reimbursement than they spent on staffing Public Hospitals, Medical Schools received excessive payments for their services,[7] and Public Hospitals were relieved of staffing costs. (*Id.* ¶¶ 101, 106.) Public Hospitals could thus make larger Transfers that resulted in larger supplemental Medicaid payments without increasing state or local taxes or otherwise making their own genuine investment, thus disrupting Medicaid's cost-sharing model. (*Id.* ¶¶ 10, 19–21.) Relator also alleges

---

[4] Although Hospital District was not a party to this contract, it was a direct beneficiary and served as the operating manager under a separate agreement. (Dkt. No. 29 ¶ 111.)

[5] The federal government's share of Medicaid funding—referred to as Federal Financial Participation—is not necessarily an exact match of the state contribution, but instead varies by state and by year. (*Id.* ¶¶ 67–68.)

[6] The upper payment limit is a cap on the amount of money a state may reimburse Medicaid providers that qualifies for federal matching. (*Id.* ¶ 82.)

[7] Relator alleges Medical Schools charged Private Hospitals for physician services at above-market rates, for services not actually performed, and for an illegitimate medical directorship program, amounting to over $50 million per year. (*Id.* ¶¶ 155–170.)

the Program was improper because it used Medicaid to cover non-indigent care at Public Hospitals and relieved Public Hospitals of their legal obligation to provide indigent care. (*Id.* ¶¶ 13, 113, 152–154.) In other words, according to Relator, the Program involved non-bona fide donations that disqualified it from receiving matching funds from the federal government. (*Id.* ¶¶ 70–81.)[8]

Relator alleges he discovered the impropriety of the Program shortly after he was hired by Hospital District in 2010. (Dkt. No. 29 ¶¶ 139–140.) According to Relator, he drew a flowchart of the entities and exchange of funds within the Program and showed it to Mike Norby, the Hospital District's Chief Financial Officer. (*Id.*) Mr. Norby stated the chart was accurate but that Relator should make certain changes in order to conceal the fact that Transfer payments were based on the Private Hospitals' donations. (*Id.*) In a further attempt to conceal this fact, Relator alleges Hospital District assigned management of the contract and related invoices to Relator's department, rather than to the finance department who calculated annual Transfer amounts, so that the donations and Transfers would appear unconnected. (*Id.* ¶ 119, 142–143.) Although Transfer amounts were supposed to be based on indigent care provided, the finance department never saw the annual indigent care reports they would have needed to do so. (*Id.* ¶¶ 124–126.)

However, according to Relator, the improper link between the donations and Transfers was clear. For example, when Hospital District refused to approve certain financial demands from Medical Schools and Medical Schools threatened to withdraw from the arrangement, Private

---

[8] A provider's donation is bona fide "only if it has no direct or indirect relationship to Medicaid payments" made to the provider, meaning the donations "are not returned to the individual provider . . . under a hold harmless provision or practice." (Dkt. No. 29 ¶ 73.) A hold harmless provision or practice exists if: (1) there is a positive correlation between a donation and Medicaid payments; (2) Medicaid payments are conditioned on receipt of a donation; or (3) there is a guarantee all or part of a donation will be returned through Medicaid payments. (*Id.* ¶¶ 74, 79.) Moreover, according to Relator, donations that involve above-market compensation or cede responsibility for indigent care to a private entity are also hold harmless arrangements. (*Id.* ¶ 80.)

Hospitals agreed to make additional support payments to Medical Schools. (Dkt. No. 29 ¶¶ 131–132.) Hospital District then deducted the same amount from the Transfers it submitted on Private Hospitals' behalf, demonstrating that the purported donations made by Private Hospitals were merely part of an exchange to receive supplemental Medicaid funds. (*Id.* ¶¶ 133–134.) Similarly, when Relator realized Medical Schools' collection rates for non-indigent treatment at Public Hospitals were extremely low, he suggested that Hospital District lower its Transfers in the same amount as the unrealized collections to incentivize better practices. (*Id.* ¶¶ 136–137.) According to Relator, this again shows an improper link between purported donations from Private Hospitals and Transfer payments. (*Id.*)

Relator alleges that everyone involved in the Program knew or should have known the donations were not bona fide because of CMS guidance letters and CMS's challenge to a similar program in Dallas and Fort Worth ("Dallas-Fort Worth Program"), among other reasons. (Dkt. No. 29 ¶¶ 202–215.) The Dallas-Fort Worth Program, according to Relator, also involved donations of indigent care services from private to public hospitals that resulted in higher Transfers and thus higher supplemental Medicaid payments from the federal government. (*Id.* ¶¶ 214–215.) CMS deferred and eventually disallowed federal payments associated with the Dallas-Fort Worth Program, a decision upheld by the U.S. Department of Health and Human Services Departmental Appeals Board ("Appeals Board"). (*Id.*)[9] Because members of the Program knew the donations were not bona fide but nonetheless caused Texas to submit inaccurate forms to CMS for

---

[9] Relator asserts the Program was "even more abusive" than the Dallas-Fort Worth Program because it diverted Medicaid funds to non-indigent care and involved above-market payments, among other reasons. (*Id.* ¶¶ 216–220.)

reimbursement—including CMS Form 64 and other certifications they had complied with the law—Relator alleges they violated the False Claims Act. (*Id.* ¶¶ 87–99, 223, 226–248.)

### B.    Procedural Background

Relator filed this action on August 31, 2017 on behalf of the United States ("Government") under the False Claims Act, 31 U.S.C. §§ 3729–3733, and the Texas Medicaid Fraud Prevention Act, TEX. HUM. RES. CODE §§ 36.001–36.117. (Dkt. No. 1.) The Government declined to intervene but remains a real party in interest in the case. (Dkt. No. 13.) On August 13, 2019, Relator filed a Second Amended Complaint. (Dkt. No. 29.) Defendants subsequently filed their joint and individual motions to dismiss (Dkt. Nos. 121–127), to which Relator responded (Dkt. Nos. 130-136) and Defendants replied (Dkt. Nos. 138–143). Relator voluntarily dismissed his claims under the Texas Medicaid Fraud Prevention Act. (Dkt. Nos. 128, 137.)

In the Joint Motion to Dismiss, Defendants argue that Relator's allegations fail under the public disclosure bar because the details of the Program were publicly known—through news articles, federal government materials, and administrative proceedings—and Relator does not qualify as an original source of this information. (Dkt. No. 121 at 11, 26–34.)[10] Relator disagrees, arguing that before he filed suit, "no public disclosure demonstrated the *quid pro quo* nature of Defendants' scheme, its breadth, or how it was carried out in ways that made it patently illegal; or even any basis to believe that these Defendants were knowingly doing anything wrong at all."

---

[10] Defendants also jointly moved to dismiss the case on several other grounds, such as failure to plead fraud with particularity. However, for the sake of judicial efficiency, the Court will first resolve the applicability of the public disclosure bar. Should the District Judge disagree by not adopting this Memorandum and Recommendation, the Court will then revisit Defendants' other grounds for dismissal.

(Dkt. No. 130 at 29–30.) Relator also believes he qualifies as an original source because he discovered important information about Defendants' scheme. (*Id.* at 38–49.)

After briefing by the parties was complete, the Court ordered the Government to file a Statement of Interest addressing the applicability of the public disclosure bar to this case. (Dkt. No. 149.) The Government filed its Statement of Interest on May 14, 2021, taking the position that the bulk of Relator's allegations fail under the public disclosure bar. (Dkt. No. 150.) First, the Government believes that all of Relator's allegations are either substantially similar to what was publicly disclosed or not critical to the alleged scheme. (*Id.* at 4–10.) Second, the Government believes Relator does not qualify as an original source for conduct occurring after the public disclosure bar was amended in 2010 because his allegations do not materially add to what was already in the public domain. (*Id.* at 13–14.) However, the Government takes no position on whether Relator qualifies as an original source for conduct occurring before the bar was amended because it is unclear whether he derived his information from the public disclosures or discovered the information while employed at the Hospital District. (*Id.* at 12–13.)

Both Relator and Defendants responded to the Government's Statement. Relator argues that, contrary to the Government's assertions, the critical elements of the Program were never publicly disclosed. (Dkt. No. 155 at 10–16.) These critical elements include: the above-market payments to Medical Schools; the use of Medicaid to cover non-indigent care; the identities of the wrongdoers; the specific way wrongdoers committed the fraud; and other facts that demonstrate wrongdoers knowingly violated the law. (*Id.* at 6–7.) Relator also argues that he qualifies as an original source under both versions of the public disclosure bar because he uncovered "the core undisclosed facts that [were] essential to pursuing a fraud case against these Defendants" during the course of his employment. (*Id.* at 21; *see also id.* at 17–23.) Defendants reiterate the

Government's position in all respects, except they believe the current record is sufficient to dismiss Relator's allegations of pre-amendment conduct. (Dkt. No. 161 at 16–19.)

Ultimately, the Court agrees with the Government and finds that Relator's post-amendment allegations should be dismissed and that Relator's pre-amendment allegations should not be dismissed at this time. The Court will allow limited discovery as to pre-amendment conduct in the form of Relator's deposition.[11]

## II.      FALSE CLAIMS ACT AND PUBLIC DISCLOSURE BAR OVERVIEW

The False Claims Act ("FCA") imposes liability on any person who knowingly submits a false or fraudulent claim for payment or approval of government funds, knowingly makes a false record or statement material to a false or fraudulent claim, or conspires to commit any such violation. 31 U.S.C. § 3729(a)(1)(A)–(C). The FCA also imposes liability on any person who knowingly makes a false record or statement material to an obligation to transmit money or property to the Government or knowingly avoids an obligation to transmit money or property to the Government. 31 U.S.C. § 3729(a)(1)(G). To determine liability under the FCA, courts must ask: "(1) whether there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)." *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 467 (5th Cir. 2009) (quotations omitted); *see also United States ex rel. King v. Solvay Pharm., Inc.*, 871 F.3d 318, 324 (5th Cir. 2017).

---

[11] Should the District Judge adopt this Memorandum and Recommendation, the parties should immediately schedule Relator's deposition. The deposition should be limited to whether Relator qualifies as an original source as to his pre-amendment allegations. The deposition may also cover Relator's claim against Hospital District for retaliation should the District Judge agree with this Court's separate Memorandum and Recommendation on the claim.

"The FCA may be enforced not just through litigation brought by the Government itself, but also through civil *qui tam* actions that are filed by private parties, called relators, in the name of the Government." *Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter*, 575 U.S. 650, 653 (2015) (quotations omitted); *see* 31 U.S.C. § 3730(b). Over time, however, "Congress learned that the bounty available to *qui tam* relators created the danger of parasitic exploitation of the public coffers." *United States ex rel. Shea v. Cellco P'ship*, 863 F.3d 923, 926 (D.C. Cir. 2017) (quotations omitted). In order to "strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits" that result in a windfall to relators, the FCA includes a public disclosure bar. *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 295 (2010); *see also United States ex rel. Colquitt v. Abbott Lab'ys*, 858 F.3d 365, 373 (5th Cir. 2017). The public disclosure bar requires dismissal where the allegations have been publicly disclosed and relator is not an original source. 31 U.S.C. § 3730(e)(4).

Congress amended the public disclosure bar in 2010 through the Patient Protection and Affordable Care Act. Before the 2010 amendment, the public disclosure bar stated:

> **(4)(A)** No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
>
> **(B)** For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4)(A)–(B) (1986). Since the 2010 amendment, the public disclosure bar states:

> **(4)(A)** The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed--**(i)** in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; **(ii)** in a

congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or **(iii)** from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

**(B)** For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C. § 3730(e)(4)(A)–(B) (2010).

The 2010 amendment thus made several notable changes. First, the amendment changed the public disclosure bar from jurisdictional to non-jurisdictional in nature, *Abbott v. BP Expl. & Prod., Inc.*, 851 F.3d 384, 387 n.2 (5th Cir. 2017), effectively making it an affirmative defense. *United States ex rel. Harman v. Trinity Indus., Inc.*, No. 12-CV-89, 2014 WL 47258, at *3 (E.D. Tex. Jan. 3, 2014). Second, in order for the public disclosure bar to apply, "the action no longer is required to be 'based upon' publicly disclosed transactions—it must instead be 'substantially the same.'" *United States ex rel. Hendrickson v. Bank of Am., N.A.*, 343 F. Supp. 3d 610, 623 (N.D. Tex. 2018) (collecting cases), *aff'd*, 779 F. App'x 250 (5th Cir. 2019). Third, the amendment changed the definition of original source: "a relator no longer must possess 'direct knowledge' of the fraud to qualify as an original source. The focus now is on what independent knowledge the relator has added to what was publicly disclosed." *Health Choice All., LLC, on behalf of United States v. Eli Lilly & Co.*, No. 17-CV-123, 2018 WL 4026986, at *9 (E.D. Tex. July 25, 2018) (quotations and alterations omitted), *report and recommendation adopted*, 2018 WL 3802072 (Aug. 10, 2018).

The 2010 amendment was not retroactive. *United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 326 n.6 (5th Cir. 2011); *see also Hughes Aircraft Co. v. United States ex rel.*

*Schumer*, 520 U.S. 939, 946 (1997) (explaining that "the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place" in the context of the 1986 addition of the public disclosure bar to the FCA) (quotations omitted). Therefore, the pre-amendment version applies to conduct occurring before the amendment became effective and the post-amendment version applies to conduct occurring after it became effective. *See Hendrickson*, 343 F. Supp. 3d at 622; *Health Choice All.*, 2018 WL 4026986, at *9.[12] Because this case involves allegations spanning from 2008 to at least 2016 when Relator was fired, both versions apply.

### III.    LEGAL STANDARDS

The appropriate legal standards for a public disclosure bar analysis depend in large part on whether the pre-amendment jurisdictional version or the post-amendment non-jurisdictional version applies. While often brought under a 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction, "[a] challenge under the FCA jurisdictional bar is necessarily intertwined with the merits and is, therefore, properly treated as a motion for summary judgment." *Jamison*, 649 F.3d at 326 (quotations and alterations omitted). On the other hand, a challenge under the non-jurisdictional bar can be evaluated as a 12(b)(6) motion to dismiss or a motion for summary judgment. *See, e.g.*, *United States ex rel. Integra Med Analytics, LLC v. Creative Sols. in Healthcare, Inc.*, No. 17-CV-1249, 2019 WL 5970283, at *8–12 (W.D. Tex. Nov. 13, 2019)

---

[12] The amendment was signed into law on March 23, 2010. However, it is unclear whether it became effective on March 23, 2010 or July 22, 2010. *Compare Green v. AmerisourceBergen Corp.*, No. 15-CV-379, 2017 WL 1209909, at *5 (S.D. Tex. Mar. 31, 2017), *with United States ex rel. Monsour v. Performance Accts. Receivable, LLC*, No. 16-CV-38, 2018 WL 4682343, at *8 (S.D. Miss. Sept. 28, 2018). This issue may not be germane depending on the information Relator provides in his deposition, such as when in 2010 he was hired and when certain conduct occurred. The parties should address the discrepancy in future motions.

(motion to dismiss); *United States ex rel. Monsour v. Performance Accts. Receivable, LLC*, No. 16-CV-38, 2018 WL 4682343, at \*14–15 (S.D. Miss. Sept. 28, 2018) (summary judgment).

Here, Defendants ask the Court to analyze the pre-amendment bar under Rule 12(b)(1) and the post-amendment bar under Rule 12(b)(6). (Dkt. No. 121 at 25.) Relator asks the Court to decide both versions under Rule 12(b)(6). (Dkt. No. 155 at 17 n.3.) Defendants find it unnecessary and Relator finds it inappropriate at this time to decide either version under summary judgment standards. (*See id.*; Dkt. No. 161 at 23 n.8.) However, because the pre-amendment jurisdictional bar is intertwined with the merits, the Court should either treat Defendants' motion regarding pre-amendment conduct as a motion for summary judgment, *see United States ex rel. Fitzgerald v. Novation, L.L.C.*, No. 03-CV-1589, 2008 WL 9334966, at \*2 n.5 (N.D. Tex. Sept. 17, 2008), or direct the parties to re-brief the issue under summary judgment standards, *see United States ex rel. Solomon v. Lockheed Martin Corp.*, No. 12-CV-4495, 2015 WL 6956578, at \*4 (N.D. Tex. Nov. 10, 2015). Moreover, the Court is currently unable to determine whether Relator's knowledge regarding the pre-amendment conduct was independent of public disclosures without further information on the source of his knowledge, as Relator began working at the Hospital District sometime in 2010.[13] The Court finds it appropriate to postpone its pre-amendment public

---

[13] The declaration Relator submitted in response to the Government's Statement of Interest is insufficient on this issue because it does not specify how and when Relator gained knowledge of the alleged misconduct that occurred before he was hired. (*See* Dkt. No. 156.) It merely states Relator had not seen most of Defendants' exhibits before this lawsuit and that "in some cases" he gained knowledge by reviewing internal documents or communicating with other employees. (*Id.*) Regardless, the Court did not consider Relator's declaration in its analysis because it would require conversion of the motion to dismiss into a motion for summary judgment, which Relator opposes.

disclosure bar analysis so that parties have an opportunity to present evidence and brief the issue under the proper standards.[14]

As to the post-amendment analysis, the public disclosure bar is non-jurisdictional in nature and thus can be properly decided under 12(b)(6) standards. Rule 12(b)(6) allows a defendant to move to dismiss a complaint based on failure to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although a complaint need not contain detailed factual allegations, it "must provide the plaintiff's grounds for entitlement to relief—including factual allegations that . . . raise a right to relief above the speculative level." *Wilson v. Houston Cmty. Coll. Sys.*, 955 F.3d 490, 500 (5th Cir. 2020) (quotations omitted).

In reviewing a 12(b)(6) motion, a court must accept "all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff." *True v. Robles*, 571 F.3d 412, 417 (5th Cir. 2009) (quotations omitted). However, a court is not bound to accept legal conclusions couched as factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286 (1986); *see Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint

---

[14] Defendants argue that, if the Court does not dismiss Relator's allegations of pre-amendment conduct based on public disclosure, it should do so on other grounds asserted in its original brief. (Dkt. No. 161 at 24.) However, the Court must first decide whether it has subject-matter jurisdiction over the conduct before reaching other grounds for dismissal. *Cf. United States ex rel. Johnson v. Planned Parenthood of Hous. & Se. Tex., Inc.*, No. 10-CV-3496, 2013 WL 9583076, at *1 n.1 (S.D. Tex. Mar. 29, 2013).

is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). "Generally, a court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Wolcott v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (quoting *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008)).

## IV.   PUBLIC DISCLOSURE BAR ANALYSIS

The Court must dismiss the action under the post-amendment public disclosure bar "if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed" and Relator does not qualify as an original source. 31 U.S.C. § 3730(e)(4). The Court asks three questions to determine whether the public disclosure bar applies:

(1) Was there a "public disclosure" of the allegations or transactions?

(2) Was the *qui tam* action "based upon" what was publicly disclosed?

(3) If so, was the relator an "original source" of the information that forms the basis of the complaint?

*Fed. Recovery Servs., Inc. v. United States*, 72 F.3d 447, 450 (5th Cir. 1995); *see also Hendrickson*, 343 F. Supp. 3d at 624–30 (applying the three-part test to both pre-amendment and post-amendment conduct). The Court addresses each question in turn.[15]

### A.   Was There a Public Disclosure of the Allegations or Transactions?

First, the Court must determine whether there was a relevant public disclosure. "As a

---

[15] Courts have leeway in this analysis and "need not follow the three steps rigidly." *Jamison*, 649 F.3d at 327. Indeed, several courts combine the first two questions "because it allows the scope of the relator's action in step two to define the 'allegations or transactions' that must be publicly disclosed in step one." *Id.*; *see Green*, 2017 WL 1209909, at \*5. The Court here addresses each question separately but notes the significant overlap between the first and second questions.

general matter, a public disclosure occurs when the essential elements exposing the particular transaction as fraudulent find their way into the public domain." *United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 208 (1st Cir. 2016) (quotations omitted). The disclosures must have occurred in certain types of public materials and "must provide enough specific details to 'set the government on the trail of the fraud.'" *United States ex rel. King v. Solvay S.A.*, No. 06-CV-2662, 2015 WL 925612, at *4 (S.D. Tex. Mar. 3, 2015) (quoting *Jamison*, 649 F.3d at 329); *see also United States ex rel. Solomon v. Lockheed Martin Corp.*, 878 F.3d 139, 144 (5th Cir. 2017).

### 1. Whether Defendants' exhibits are qualifying materials

In order to qualify, the information must have been disclosed in: (1) "a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;" (2) "a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation;" or (3) the news media. 31 U.S.C. § 3730(e)(4)(A). Defendants identify several such documents—of which they ask the Court to take judicial notice—that they believe sufficiently disclosed the Program. (Dkt. No. 121 at 13, 27–29.) These documents include:

News Articles

- Robert T. Garrett & Sherry Jacobson, *Texas Hospitals Face End of Funding Plan*, THE DALLAS MORNING NEWS, October 6, 2007. (Dkt. No. 121-2 at 135–136.)
- Melissa Mcever, *Indigent Program Drawing Scrutiny*, VALLEY MORNING STAR, July 14, 2008. (Dkt. No. 121-3 at 2–5.)
- Mary Ann Roser, *State's Medicaid Overhaul Draws Federal Scrutiny*, AUSTIN AMERICAN-STATESMAN, March 29, 2015. (*Id.* at 7–9.)
- Marsha Shuler, *La. Hospitals Watch Texas Funding Issue*, THE ADVOCATE, October 18, 2014. (*Id.* at 11–12.)
- Edgar Walters, *North Texas Hospitals Face $27 Million Penalty in Medicaid Dispute*, TEXAS TRIBUNE, September 7, 2016. (*Id.* at 14–19.)
- Matt Goodman, *Breaking Down Why CMS Wants $27 Million Back From Dallas Area Hospitals*, D CEO HEALTHCARE, September 8, 2016. (*Id.* at 21–23.)

Federal Government Materials

- *Intergovernmental Transfers: Violations of the Federal-State Medicaid Partnership or Legitimate State Budget Tool?* Transcript of Hearings before the House of Representatives Subcommittee on Health of the Committee on Energy and Commerce, March 18 and April 1, 2004. (*Id.* at 25–140.)
- *Accountability #2: Financing and Donations*, Letter from Cindy Mann of CMS to State Medicaid Directors, May 9, 2014. (*Id.* at 142–147.)
- *Examining the Federal Government's Failure to Curb Wasteful State Medicaid Financing Schemes*, Transcript of Hearing before the House of Representatives Subcommittee on Energy Policy, Health Care and Entitlements of the Committee on Oversight and Government Reform, July 29, 2014. (Dkt. No. 121-4 at 2–181.)

Administrative Filings[16]

- Texas's Notice of Appeal to Appeals Board, February 24, 2017. (*Id.* at 183–185.)
- Letter from CMS to Texas regarding disallowance, attached to Texas's Notice of Appeal, September 1, 2016. (*Id.* at 187–190.)
- Letter from Texas to CMS regarding disallowance, attached to Texas's Notice of Appeal, October 28, 2016. (Dkt. No. 121-5 at 2–13.)
- Texas's Administrative Brief, June 1, 2017. (*Id.* at 38–77.)
- Letter from Texas to CMS regarding State Plan Amendment 05-011, attached to Texas's Administrative Brief, June 30, 2006. (*Id.* 15–36.)
- Letter from CMS to Texas regarding State Plan Amendment 05-011, attached to Texas's Administrative Brief, September 5, 2006. (Dkt. No. 121-6 at 2–6.)
- Letter from CMS to Texas regarding deferral, attached to Texas's Administrative Brief, October 5, 2007. (*Id.* at 8–10.)
- Letter from Texas to CMS regarding deferral, attached to Texas's Administrative Brief, February 4, 2008. (*Id.* at 12–24.)
- Internal CMS email regarding release of deferrals, attached to Texas's Administrative Brief, May 19, 2008. (*Id.* at 26–27.)
- Letter from CMS to Texas regarding deferral, attached to Texas's Administrative Brief, September 30, 2014. (*Id.* at 29–31.)
- Email from Texas to CMS regarding private hospital funding, attached to Texas's Administrative Brief, May 28, 2015. (Dkt. No. 121-7 at 2–10.)
- Email from CMS to Texas regarding private hospital funding, attached to Texas's Administrative Brief, June 9, 2015. (*Id.* at 12.)
- Brief of Intervenors, June 9, 2017. (Dkt. No. 121-8 at 2–28.)
- Appeals Board Decision, August 7, 2018. (*Id.* at 30–65.)

---

[16] Each of these documents were filed in Texas's administrative appeal of Medicaid disallowance in the Dallas-Fort Worth Program, No. A-17-51.

The Court finds that these documents fall under the categories enumerated by statute. *See, e.g.*, *United States ex rel. Sonnier v. Standard Fire Ins. Co.*, 84 F. Supp. 3d 575, 586–90 (S.D. Tex. 2015) (finding news articles and congressional hearing testimony to be qualifying materials); *United States ex rel. Williams v. C. Martin Co.*, No. 07-CV-6592, 2013 WL 4519324, at *10 (E.D. La. Aug. 23, 2013) (finding administrative decision and complaint to be qualifying materials). Relator argues that the administrative filings—except for the actual Appeals Board Decision— were not publicly available and thus are not qualifying sources or appropriate for judicial notice. (*See* Dkt. No. 130 at 14; Dkt. No. 155 at 12 n.1.) However, documents that are not filed under seal and are available upon request are considered public. *Williams*, 2013 WL 4519324, at *10. "There is no evidence that [the administrative documents were] filed under seal and/or not available at request," *id.*, and thus the Court finds they were sufficiently public.

Federal Rule of Evidence 201 allows courts to take judicial notice of facts that are "not subject to reasonable dispute" because they are either generally known or capable of accurate and ready determination. FED. R. EVID. 201(b). Pursuant to this rule, courts may take judicial notice of public newspaper articles, *see United States ex rel. Lam v. Tenet Healthcare Corp.*, 481 F. Supp. 2d 673, 680 (W.D. Tex. 2006), public congressional testimony, *see United States ex rel. Branch Consultants, L.L.C. v. Allstate Ins. Co.*, 668 F. Supp. 2d 780, 789 (E.D. La. 2009),[17] and public administrative decisions, *see Hooker v. Dall. Indep. Sch. Dist.*, No. 09-CV-676, 2010 WL

---

[17] To the extent the Letter from Cindy Mann dated May 9, 2014 does not fall under this category or is not otherwise appropriate for judicial notice, it can still be considered on a 12(b)(6) motion based on Relator's reliance on the letter—including extensive quotation of the letter's contents—in his complaint. (*See* Dkt. No. 29 ¶¶ 79–81, 113, 153, 213); *In re Enron Corp. Sec., Derivative & "Erisa" Litig.*, No. 01-CV-3624, 2003 WL 23316646, at *5 (S.D. Tex. Mar. 27, 2003) ("The Court may also consider documents integral to and explicitly relied on in the complaint, that the defendant appends to his motion to dismiss, as well as the full text of documents that are partially quoted or referred to in the complaint.") (quotations omitted).

4025776, at *4 (N.D. Tex. Sept. 13, 2010), *report and recommendation adopted*, 2010 WL 4024896 (Oct. 13, 2010). Courts may also take judicial notice of other public filings in administrative proceedings. *See Thomas v. Esper*, No. 18-CV-110, 2019 WL 3026951, at *3–4 (E.D. Tex. May 22, 2019), *report and recommendation adopted*, 2019 WL 3017418 (July 10, 2019). The Court, therefore, takes judicial notice of the documents outlined above as qualifying materials under the public disclosure bar.[18]

### 2.   Whether the critical elements of fraud were disclosed in these materials

"[T]he key for determining whether allegations or transactions have been publicly disclosed is whether the critical elements of the fraudulent transaction were in the public domain." *United States ex rel. Colquitt v. Abbott Lab'ys*, 864 F. Supp. 2d 499, 519 (N.D. Tex. 2012) (quotations omitted), *aff'd*, 858 F.3d 365 (5th Cir. 2017). "The critical elements have been sufficiently disclosed if the disclosures, taken together, would enable the government to draw an inference of fraud." *Id.* (quotations omitted). The Fifth Circuit has adopted the test outlined in *United States ex rel. Springfield Terminal Railway Co. v. Quinn*, 14 F.3d 645 (D.C. Cir. 1994) for making this determination. *Solomon*, 878 F.3d at 144; *Integra*, 2019 WL 5970283, at *9. "To find a public disclosure under this test, the Court must find both the misrepresented state of facts ('X') and the true state of facts ('Y') that together give rise to an inference of fraud ('Z'). The presence of [X] or [Y] in the public domain, but not both, cannot be expected to set government investigators on the trail of fraud." *Hendrickson*, 343 F. Supp. 3d at 626 (quotations and citations omitted); *see*

---

[18] Relator argues the Court cannot use any of the exhibits for the truth of their content. (Dkt. No. 130 at 14.) The Court uses these documents only to determine what information was publicly disclosed. *See Branch*, 668 F. Supp. 2d at 789.

*also Integra*, 2019 WL 5970283, at *9 (applying the *Springfield* test to the first question in its public disclosure bar analysis).

Defendants argue that the public sources identified above, when taken together, disclosed all critical aspects of the Program and CMS's concerns about it. (Dkt. No. 121 at 26–38.) This includes identification of particular participants in the Program, its *quid pro quo* nature, and its use of potentially non-bona fide donations to generate cost-savings and fund the non-federal share of Medicaid. (Dkt. No. 138 at 11–12.) According to Defendants, any information not included in their identified exhibits was only secondary to the alleged scheme and thus does not render the public disclosure bar inapplicable. (*Id.* at 15–16.) The Government takes the *same* position as Defendants. (Dkt. No. 150 at 4–10.)

Relator contends that the alleged public disclosures were too general and "do not come close to being sufficient" to trigger the public disclosure bar. (Dkt. No. 130 at 29.) Specifically, Relator argues that there were no public disclosures under the *Springfield* test because the true state of affairs (Y)—*i.e.*, the identity of the wrongdoers, the specific way they committed the fraud, the above-market compensation and coverage of non-indigent patients, and the attempts at concealment—were not in the public domain. (Dkt. No. 130 at 29–30; Dkt. No. 155 at 10–16.) In other words, without his "insider roadmap," Relator believes the Government would have been unable to discover the impropriety of the Program. (Dkt. No. 130 at 31.) The Court agrees with Defendants and the Government that the critical elements of the Program were publicly disclosed.

First, the six news articles Defendants cite revealed the *quid pro quo* nature of private-public hospital partnerships throughout Texas—including in Houston—and CMS's concerns that they involved non-bona fide donations to increase federal Medicaid funding. The 2007 *Dallas Morning News* article discussed the federal government's concern with hospital arrangements

similar to the Program and specifically mentioned Houston. (Dkt. No. 121-2 at 135–136.) The 2008 article from *Valley Morning Star* reported on CMS's awareness of the potential problem, and the 2015 article from the *Austin American-Statesman* noted CMS was monitoring "most of the state" regarding these hospital arrangements. (Dkt. No. 121-3 at 2–5, 7–9.) The 2014 article from *The Advocate* described the mechanics of improper arrangements in almost the exact way Relator describes the Program:

> Under the [potentially improper] deals, a private company agrees to provide the health care services that had been provided by a public entity. The arrangement frees the government dollars that had been spent by the public entity. The public funds are directed to Medicaid coffers to increase the state's match, which in turn brings more federal funds. The private company then receives supplemental payments from Medicaid.

(*Id.* at 12.) Several other articles covered the same information. (*Id.* at 14–15, 21–22.)

Relator contends that the news articles revealed "only generalized information" and "nothing of the detailed, intentional fraud set out in the [Second Amended Complaint]." (Dkt. No. 130 at 36.) However, "public disclosures need not name particular defendants so long as they 'alerted the government to the industry-wide nature of the fraud and enabled the government to readily identify wrongdoers through an investigation.'" *Jamison*, 649 F.3d at 329 (quoting *In re Nat. Gas Royalties*, 562 F.3d 1032, 1039 (10th Cir. 2009)). The news articles referenced other Texas arrangements similar to the Program, described CMS's industry-wide concerns, and specifically referred to Houston.

Second, congressional testimony and the letter by CMS Director Cindy Mann (the "Mann Letter") revealed CMS's position on the private-public hospital partnerships, explicitly identified Hospital District's involvement in such a partnership, and illustrated a public discussion surrounding the arrangements. In 2004, Congressman Raymond Green testified at a subcommittee meeting on Transfers that "Harris County Hospital District, which is a major health provider for

low income and Medicaid populations in the city of Houston, use[d] [Transfers] to drawdown

$72.7 million in upper payment limits . . . in 2003." (Dkt. No. 121-3 at 39.) The Mann Letter

recognized:

> In some cases, the [Transfer amount] is derived from funds that the government
> entity previously would have spent on providing the services that are now being
> provided by the private entity. These funds would not be available if not for the
> public-private partnership agreements. [T]his type of arrangement would not be
> considered a bona fide donation under Medicaid requirements.

(*Id.* at 144.) It also explained that arrangements involving above-market payments or a private

hospital's assumption of governmental duties, which result in increased Transfers and thus

increased federal funding, also constitute non-bona fide donations. (*Id.* at 144–145.)

Relator argues Congressman Green's testimony did not "reveal the true state of affairs"

because it actually describes Hospital District's compliance with the law. (Dkt. No. 130 at 32–33.)

Relator also argues the Mann Letter did "no more than restate the law and give examples of the

types of violations that could occur." (*Id.* at 30.) The Court disagrees. These documents together

showed that there were public discussions about Hospital District's Transfer model and that such

funding models were under scrutiny. The "very essence" of the Program was in the public domain.

*United States ex rel. Fried v. W. Indep. Sch. Dist.*, 527 F.3d 439, 442 (5th Cir. 2008).

Third, the administrative filings echoed the information contained in the news articles and

federal reports and specifically identified the Private Hospitals involved in the Program. These

documents explained that Texas appealed CMS's disallowance of Medicaid funds for the Dallas-

Fort Worth Program which, in Relator's own view, operated under a similar model as the Program.

(Dkt. No. 121-4 at 183–185; Dkt. No. 121-8 at 30–65.)[19] Moreover, an exhibit attached to Texas's brief listed relationships between private and public hospitals throughout the state, including Hospital District's relationship with most or all of the Private Hospitals involved in this case. (Dkt. No. 121-7 at 2–10.) Relator's argument that these documents cannot constitute public disclosures because they did not discuss certain particulars of the Program is unavailing, as explained below. The Appeals Board proceedings generated significant disclosures relevant to the Program.

In sum, Relator views each disclosure in a vacuum and argues why it is individually insufficient to put the Government on the trail of fraud. However, the question before the Court is whether any or all of this information *adds up* to a public disclosure as contemplated by the FCA. *See Hendrickson*, 343 F. Supp. 3d at 626 ("Certain of the disclosures cited by Defendants, *when considered collectively*, publicly disclose the allegations or transactions alleged by Relator[.]") (emphasis added). Contrary to Relator's assertion, the news articles, congressional reports and testimony, and administrative documents together reveal the allegedly true state of affairs (the "Y" in the *Springfield* test).[20] When considered with the alleged misrepresentations of the Program's legality (the "X"),[21] the disclosures give rise to an inference of fraud (the "Z"). The Court, therefore, finds that sufficient public disclosure of the Program did occur.

---

[19] *See also* Dkt. No. 29 ¶¶ 214–221 (Relator's complaint characterizing the Dallas-Fort Worth Program as similar to, albeit less egregious than, the Program and using those proceedings to assert Defendants here knew the Program was improper).

[20] The Court addresses Relator's argument as to the use of above-market compensation and coverage of non-indigent patients in Section IV.B below. As will be discussed, these additional facts are not critical because, under Relator's own view of the law, the scheme would still be fraudulent without them.

[21] Relator never identifies what misrepresentations constitute the "X" in the *Springfield* test. Defendants assert the representations of the Program's legality—as expressed in Texas's administrative appeal and brief, among other documents—constitute the "X." (Dkt. No. 138 at 14.)

### B.  Are the Allegations "Based Upon" the Public Disclosures?

The Court must next compare the public disclosures to the allegations in the complaint to determine if the allegations are based on the public disclosures. The 2010 amendment changed the statutory language from whether the action was "based upon" public disclosure to whether the action was "substantially the same" as the public disclosure. *See* 31 U.S.C. § 3730(e)(4)(A). However, the inquiry essentially remains the same: "[a] complaint is 'substantially the same as' or 'based upon' public disclosures if one could have produced the substance of the complaint merely by synthesizing the public disclosures' description of the scheme." *Integra*, 2019 WL 5970283, at *10 (quotations and alterations omitted). This standard is not onerous and is satisfied even if a relator "uncovered some nuggets of new . . . information." *Fried*, 527 F.3d at 442; *see also Fitzgerald*, 2008 WL 9334966, at *3.

The Second Amended Complaint discusses "a conspiracy to obtain excessive federal Medicaid supplemental payment funds and [to] spend a substantial portion of those funds for improper purposes." (Dkt. No. 29 ¶ 2.) It alleges that Defendants caused "federal funds intended for under-compensated and uncompensated indigent and uninsured care to fraudulently be drawn down and spent without the Congressionally-required contribution of state and/or local government matching funds." (*Id.* ¶ 3.) It also discusses the "three-way trade of cash and services" that filter between Medical Schools, Public Hospitals, and Private Hospitals. (*Id.* ¶ 7.)

It is clear to the Court that the allegations in the public disclosures are substantially the same as those in Relator's complaint. Both allege that certain hospitals purposefully engaged in arrangements that were designed to tie private hospitals' donations to public hospitals' Transfers, which would trigger the federal government's payment of supplemental Medicaid funds back to private hospitals. Both identify the key entities involved. Both explain CMS's concerns that such

programs violate Medicaid and its intended cost-sharing model, and both reveal that Texas maintained the legality of such programs. Relator's allegations and the public disclosures correlate sufficiently in scope and make Defendants' alleged misconduct readily identifiable. *See Little v. Shell Expl. & Prod. Co.*, 690 F.3d 282, 293 (5th Cir. 2012).

The Court acknowledges that certain aspects of Relator's allegations—the above-market payments and coverage of non-indigent care—were not in the public domain. However, these allegations are not vital to the Program's structure as described by Relator himself. (*See* Dkt. No. 130 at 23–24 (Relator's Summary of Argument stating: "The crux of the [Second Amended Complaint] is that the Program's illegal purpose was to tie the private hospitals' donations to [Transfers] that would trigger the federal government's payment of supplemental Medicaid funds back to the private hospitals, and the [Second Amended Complaint] supplies the key facts establishing that a consistent practice—tantamount to a *quid pro quo* arrangement—existed.").) Indeed, under Relator's theory of the case, the Program would still have been illegal without these particular allegations. (*See* Dkt. No. 29 ¶¶ 73–74 (Relator's complaint asserting a hold harmless agreement can exist solely based on the correlation between donations and Medicaid payments).) Furthermore, the above-market payments to Medical Schools did not increase the amount of funds available to transfer from Public Hospitals to Texas and therefore did not impact the amount of Medicaid funds allegedly stolen from the federal government. (*See* Dkt. No. 150 at 9–10.) The extra allegations provided by Relator do not alter the fundamental nature of the alleged scheme.

Given the substantial similarities between Relator's allegations and the public disclosures, the Court finds that Relator's suit is based upon the public disclosures. *See, e.g.*, *King*, 2015 WL 925612, at *8 ("While [the public disclosure] does not perfectly mirror everything alleged in the original complaint, . . . there are certainly enough similarities for the court to conclude that the

allegations are based on the public disclosure. It is not necessary for the disclosure to connect all the dots or reach legal conclusions, it just has to set the government on the trail of fraud."). The action should be barred unless Relator qualifies as an "original source."

### C.  Was Relator an Original Source?

Finally, the Court must decide whether the original source exception applies in this case. The original source exception exists because "a relator who brings new evidence of wrongdoing that may already be in the public domain still strengthens the government's case . . . and thus should be allowed to share in the recovery she helped achieve." *Colquitt*, 858 F.3d at 376. "Indeed, when the investigation or experience of the relator translates into some additional compelling fact, or demonstrates a new and undisclosed relationship between disclosed facts, the relator may proceed as an original source despite public disclosure." *Integra*, 2019 WL 5970283, at *11 (quotations and alterations omitted). Under the post-amendment public disclosure bar, an original source is an individual who "has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action." 31 U.S.C. § 3730(e)(4)(B).[22]

As to the voluntary disclosure requirement, Defendants originally argued Relator did not voluntarily disclose information to the Government before filing suit, or at least that he failed to allege or provide evidence that he did so. (Dkt. No. 121 at 39–40; Dkt. No. 138 at 16–17.) However, the Government confirmed that Relator voluntarily provided it with a draft of his

---

[22] An individual who "voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based" before the public disclosure occurred can also be an original source under the post-amendment public disclosure bar. 31 U.S.C. § 3730(e)(4)(B). However, Relator does not argue that he qualifies under this definition.

complaint before filing. (Dkt. No. 150 at 10.) Relator thus satisfies the pre-filing disclosure requirement under the post-amendment public disclosure bar.

As to the other original source requirements, Relator asserts that the information he provided is independent of, and materially adds to, any public information. (Dkt. No. 130 at 39.) Specifically, Relator contends that his information—*i.e.*, the fact Private Hospitals served non-indigent patients and paid Medical Schools above-market rates—"provides significant detail critical to understanding the fraud scheme." (*Id.* at 41.) Defendants argue that these "additional details . . . do not reveal anything essential about how these types of collaborative agreements are allegedly fraudulent" and fail to add value to the underlying allegations. (Dkt. No. 121 at 43.) The Government also believes Relator's knowledge fails to materially add to the publicly disclosed allegations about the underlying conduct. (Dkt. No. 150 at 13–14.)

The Court agrees with Defendants and the Government that any additional detail Relator provided does not materially add to the alleged fraud scheme. The Court agrees with the Government's reasoning:

> The non-public allegations in the Complaint are not, "sufficiently significant or essential so as to fall into the narrow category of information that materially adds to what has already been revealed through public disclosures." *Green v. AmerisourceBergen Corp.*, No. 4:15-CV-379, 2017 WL 1209909, at *9 (S.D. Tex. Mar. 31, 2017) (quoting *United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 211 (1st Cir. 2016)). They "merely add[] detail or color to previously disclosed elements of an alleged scheme." *Winkelman*, 827 F.3d at 213.

(Dkt. No. 150 at 13.) Because the Court finds Relator failed to materially add to the publicly disclosed allegations, it need not address whether Relator's knowledge is independent of the publicly disclosed allegations. Relator does not qualify as an original source as to conduct after the 2010 amendment and his related allegations must be dismissed under the public disclosure bar.

## V.    LEAVE TO AMEND

Relator seeks leave to amend the Second Amended Complaint should the Court find any of his allegations deficient. (Dkt. No. 130 at 69.) Rule 15 of the Federal Rules of Civil Procedure directs courts to "freely give leave [to amend the pleadings] when justice so requires." FED. R. CIV. P. 15(a)(2). However, leave to amend is within the sound discretion of the court and can be appropriately denied when "it is clear that the defects [of a complaint] are incurable." *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002). In fact, courts frequently deny leave when a party fails to submit a proposed pleading or explain how he can cure any defects. *See Goldstein v. MCI WorldCom*, 340 F.3d 238, 254-55 (5th Cir. 2003). Relator has not explained how he would cure the deficiencies described above or how he could otherwise avoid dismissal under the post-amendment public disclosure bar.[23] Relator also has not submitted a proposed third amended complaint. The Court finds amendment of the complaint would be futile and recommends dismissing Relator's post-amendment allegations with prejudice.

## VI.    CONCLUSION

Based on the foregoing, the Court **RECOMMENDS** that the Joint Motion to Dismiss (Dkt. No. 121) be **GRANTED IN PART** and **DENIED IN PART WITHOUT PREJUDICE** and that the separate Motions to Dismiss (Dkt. Nos. 122, 124–127) be **DENIED AS MOOT**. The Court addresses Hospital District's Motion to Dismiss (Dkt. No. 123) in a separate Memorandum and Recommendation.

---

[23] Relator does state he can amend his complaint to allege voluntary disclosure to the Government before filing suit. (Dkt. No. 130 at 40.) However, because the Government confirmed that Relator made required disclosures, the Court did not find this to be a ground for dismissal.

The Court reiterates that it has only addressed Defendants' public disclosure bar argument and that, should the District Judge disagree and not adopt this Memorandum and Recommendation, the Court will revisit the other grounds for dismissal. Should the District Judge adopt this Memorandum and Recommendation, Relator must be immediately deposed. The deposition should be limited to inquiries into whether Relator qualifies as an original source under the pre-amendment public disclosure bar. The deposition may also cover Relator's retaliation claim against Hospital District, should the District Judge adopt the Court's separate Memorandum and Recommendation on that claim. Defendants may then move for summary judgment.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers of the Undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas on August 4, 2021.

Sam S. Sheldon
United States Magistrate Judge