UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KENT VAUGHN, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 4:17-CV-2749 |
| HARRIS COUNTY HOSPITAL DISTRICT, *et al.*, | § § § § | |
| Defendants. | § § | |

## MEMORANDUM AND RECOMMENDATION

This is a *qui tam* action brought by Relator on behalf of the United States under the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"), alleging generally that Defendants—who are various medical schools and public and private hospitals in Harris County, Texas—engaged in a scheme to defraud the United States Government in relation to its share of Medicaid expenses. (Dkt. No. 29.) Defendants filed several motions to dismiss (Dkt. Nos. 121–122, 124–127), which the Court addressed in a separate Memorandum and Recommendation. (Dkt. No. 166.) Pending before the Court[1] is Defendant Harris County Hospital District's Motion to Dismiss Relator's claim for retaliation. (Dkt. No. 123.) Based on a thorough review of the motion, arguments, and relevant law, the Court **RECOMMENDS** the Motion to Dismiss be **DENIED**.

### I.    BACKGROUND

The Court explained the details of the allegedly fraudulent scheme in its first Memorandum and Recommendation ("First M&R") and need not fully repeat them here. (Dkt. No. 166.)

---

[1] This case was referred to the Undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. (Dkt. No. 145.)

Nonetheless, the Court provides a general overview of the scheme and the particular facts relevant to Relator's retaliation claim below.

Relator Kent Vaughn ("Relator") was hired by Defendant Harris County Hospital District ("Hospital District")[2] as its Associate Administrator for Provider Practices and Contracting in 2010. (Dkt. No. 29 ¶ 25.) In this position, Relator oversaw contracts between various medical entities, including a July 1, 2008 contract between Defendant Harris County Clinical Services ("Clinical Services") and Defendant Affiliated Medical Services ("Medical Schools"). (*Id.* ¶¶ 25, 100.)[3] Although Hospital District was not a party to this contract, it was a direct beneficiary and served as the operating manager under a separate agreement. (*Id.* ¶ 111.) According to Relator, this contract formed the basis of a scheme between Hospital District and its affiliates ("Public Hospitals"), Clinical Services and its affiliates ("Private Hospitals"), and Medical Schools to divert excessive Medicaid funds for their own financial benefits. (*Id.* ¶¶ 5, 110.)

Relator alleges the scheme—which the Court hereinafter refers to as the "Program"—involved a three-way trade of cash in which Private Hospitals paid Medical Schools an above-market rate to staff Public Hospitals at no cost to the Public Hospitals, making it appear Private Hospitals had made donations for indigent care. (*Id.* ¶¶ 7, 110.) Public Hospitals then used the savings generated by not paying its own medical staff to fund intergovernmental transfers ("Transfers") to Texas, which in turn used the money to pay its share of Medicaid funds to the Centers for Medicare and Medicaid Services ("CMS") at the federal level. (*Id.* ¶¶ 4, 65.) CMS then

---

[2] Hospital District is the public hospital system that provides care for indigent and non-indigent patients in Harris County, Texas. (Dkt. No. 29 ¶ 36.)

[3] Clinical Services is a non-profit umbrella organization composed of private hospitals in Harris County. (*Id.* ¶ 26.) Medical Schools is a non-profit health system organization composed of Baylor College of Medicine and UT Health Science Center. (*Id.* ¶ 43.)

matched Texas's contributions and the sum was eventually paid to Private Hospitals at a substantial profit. (*Id.* ¶¶ 7–11.) Relator believes the Program was an illegal *quid pro quo* arrangement because it involved non-bona fide donations ineligible for federal matching and benefited everyone but the federal government. (*Id.* ¶¶ 70–81, 103.)[4] Relator also alleges the Program was improper because it used Medicaid to cover non-indigent care and relieved Public Hospitals of their legal obligation to provide indigent care. (*Id.* ¶¶ 13, 113, 152–154.)

Relator alleges he uncovered the scheme throughout the course of his employment and consistently tried to address his concerns with those involved.

- On June 23, 2011, Relator sent an email to Hospital District's Executive Vice President of Clinical Operations, Beth Cloyd, and Medical Schools summarizing a federal lawsuit on above-market compensation for medical schools. (Dkt. No. 29 ¶ 179.) He discussed this issue at subsequent meetings and followed up with his supervisors and Hospital District board members, but his proposed changes to the Program were met with significant resistance. (*Id.* ¶¶ 179–181.)

- In 2014 or after, Relator forwarded a report written by another Hospital District employee—which found Medical Schools were paid tens of millions of dollars over fair-market value in 2013—to Medical Schools, senior management at Hospital District, and Harris County Commissioners. (*Id.* ¶¶ 182–186.) Relator then attempted to address his concerns with George Masi—who replaced Ms. Cloyd as his new boss—and strongly recommended an audit of the Program. (*Id.* ¶ 187.) According to Relator, Mr. Masi allowed only an oral audit to take place. (*Id.*)

- On August 22, 2014, Relator wrote a letter to Hospital District's compliance committee "formally inform[ing] them that [Medical Schools] had been charging over [fair-market value] for physician and medical director services, and that violations of the False Claims Act had occurred and were continuing to occur." (*Id.* ¶ 188.) In response, the compliance committee launched an investigation into Relator that resulted in a censure letter by Mr. Masi. (*Id.* ¶ 189.)

- In February 2015, the Harris County Auditor issued a report attempting to blame Relator for overpayments to Medical Schools. (*Id.* ¶ 190.) According to Relator, Mr. Masi urged him not to complain about this report and stated "you will lose and

---

[4] Private Hospitals received more Medicaid reimbursement than they spent on staffing Public Hospitals, Medical Schools received excessive payments for their services, and Public Hospitals were relieved of staffing costs. (*Id.* ¶¶ 101, 106.)

> suffer consequences if you do." (*Id.* ¶ 191.) Relator nevertheless lodged a complaint with Hospital District and was subsequently transferred to a different department with a different supervisor, Mike Norby. (*Id.*)

- Relator continued to oversee the Program contract and invoices under Mr. Norby. (Dkt. No. 29 ¶¶ 192–194.) Unlike his previous supervisors, however, Mr. Norby instructed Relator to sign invoices under his own name. (*Id.* ¶ 195.) This made Relator uncomfortable, and he wrote a letter in July 2015 to Hospital District's board members, its compliance committee, and Harris County Judge and Commissioners. Relator explained the above-market compensation and the retaliation he faced for attempting to address it. (*Id.* ¶¶ 196–197.)

- In September 2015, Relator filed a grievance letter with Hospital District addressing the censure letter and other retaliation against him after he identified FCA violations. (*Id.* ¶ 198.) Relator was fired on February 11, 2016. (*Id.* ¶ 200.)

Relator filed this action on August 31, 2017 on behalf of the United States ("Government"), alleging Public Hospitals, Private Hospitals, and Medical Schools violated the FCA by submitting false or fraudulent forms to CMS in furtherance of their scheme. (Dkt. No. 1.)[5] The Government declined to intervene. (Dkt. No. 13.) Relator filed a First Amended Complaint on October 23, 2017 and a Second Amended Complaint on August 13, 2019. (Dkt. Nos. 3, 29.) In Relator's Second Amended Complaint, he alleges an FCA retaliation claim against Hospital District under 31 U.S.C. § 3730(h)(2). (Dkt. No. 29 ¶¶ 249–251.) As described in the Court's First M&R, Defendants then filed joint and individual motions to dismiss. (Dkt. Nos. 121–127.) In its individual motion, Hospital District seeks dismissal of the retaliation claim under Rule 12(b)(6), arguing Relator failed to plead that he engaged in protected activity, that Hospital District knew he engaged in protected activity, and that Hospital District retaliated because of engagement in protected activity. (Dkt. No. 123 at 16–22.)[6] The Court finds dismissal inappropriate at this time.

---

[5] Relator brought claims under Texas law, but later dismissed them. (Dkt. Nos. 128, 137.)
[6] Hospital District also seeks to dismiss the other claims against it. (*See* Dkt. No. 123.) However, its arguments as to those claims are either moot—as they pertain to the Texas-law claims

## II. LEGAL STANDARDS UNDER RULE 12(b)(6)

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Rule 12(b)(6) allows a defendant to move to dismiss a complaint based on failure to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although a complaint need not contain detailed factual allegations, it "must provide the plaintiff's grounds for entitlement to relief—including factual allegations that . . . raise a right to relief above the speculative level." *Wilson v. Houston Cmty. Coll. Sys.*, 955 F.3d 490, 500 (5th Cir. 2020) (quotations omitted).

In reviewing a 12(b)(6) motion, a court must accept "all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff." *True v. Robles*, 571 F.3d 412, 417 (5th Cir. 2009) (quotations omitted). However, a court is not bound to accept legal conclusions couched as factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286 (1986); *see Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). "Generally, a court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Wolcott v.*

---

Relator has since dismissed—or are covered by the public disclosure bar—as addressed in the Court's First M&R. The Court thus addresses only the arguments pertaining to retaliation.

*Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (quoting *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008)).

### III. RETALIATION UNDER THE FCA

The FCA provides a cause of action for employees that experience retaliation—including discharge, demotion, suspension, threats, harassment, or discrimination of any kind—in response to their activities "in furtherance of an [FCA] action" or their "efforts to stop [one] or more violations" of the FCA. 31 U.S.C. § 3730(h)(1). The purpose of this provision is "to encourage those with knowledge of fraud to come forward." *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994). To sufficiently plead an FCA retaliation claim, an employee must allege: (1) he engaged in protected activity; (2) his employer knew about the protected activity; and (3) he was retaliated against because of his protected activity. *United States ex rel. Bias v. Tangipahoa Par. Sch. Bd.*, 816 F.3d 315, 323 (5th Cir. 2016); *see also United States ex rel. Johnson v. Kaner Med. Grp.*, 641 F. App'x 391, 395 (5th Cir. 2016). The Court addresses each element in turn.

#### A. Whether Relator Engaged in Protected Activity

The Court must first determine whether Relator alleged he engaged in protected activity. To qualify as protected, the activity must be "in furtherance of" uncovering fraud or potential fraud against the government. 31 U.S.C. § 3730(h)(1); *Johnson*, 641 F. App'x at 396. For internal complaints to constitute protected activity, the complaints must concern false or fraudulent claims for payment submitted to the government. *United States ex rel. Patton v. Shaw Servs., L.L.C.*, 418 F. App'x 366, 372 (5th Cir. 2011); *see Robertson*, 32 F.3d at 952 (finding no protected activity where employee "never characterized his concerns as involving illegal, unlawful, or false-claims investigations"). In other words, the internal complaints cannot "merely address concerns about

general misconduct." *Guerrero v. Total Renal Care, Inc.*, No. 11-CV-449, 2012 WL 899228, at *5 (W.D. Tex. Mar. 12, 2012); *see also United States ex rel. Johnson v. Kaner Med. Grp., P.A.*, No. 12-CV-757, 2014 WL 7239537, at *8 (N.D. Tex. Dec. 19, 2014) ("Mere criticism by an employee of the employer's methods of conducting business, without any suggestion that the employee was attempting to expose illegality or fraud *within the meaning of the FCA*, does not rise to the level of protected activity.") (quotations and alterations omitted).

Hospital District argues that Relator only raised concerns about the contract between Private Hospitals and Medical Schools—particularly the above-market compensation paid to Medical Schools—and never alleged during his employment that false claims were submitted to the Government. (Dkt. No. 123 at 17–18.) Hospital District does acknowledge that Relator's August 2014 letter referenced the FCA, but argues that the Second Amended Complaint's description of this letter involves only a "bald assertion" of fraud. (*Id.* at 19.) Hospital District also acknowledges Relator's June 2011 email about a federal lawsuit involving above-market compensation and the FCA, but argues this email was only an agenda item to be discussed and not a "warning" about potential FCA liability. (Dkt. No. 141 at 8–9.) According to Hospital District, "[a] few stray references to the FCA—without any detail how there might be a violation or who might be committing it—cannot change the clear nature of Relator's internal concerns, which addressed only contract compliance and payments between private parties." (*Id.* at 9.)

Relator argues that his concerns about above-market compensation were not merely general criticisms about how business was conducted and that he sufficiently connected the payments to potential FCA violations during his employment and in his Second Amended Complaint. (Dkt. No. 132 at 18–19.) He asserts that Hospital District's argument to the contrary is an attempt to "conjur[e] a false distinction between [Hospital District's] performance under the

[contract] and its central role in causing the submission of false claims to the federal government." (*Id.* at 19.) Relator points to four particular instances, as pleaded in his Second Amended Complaint, in which he raised FCA concerns: (1) the June 2011 email to Medical Schools and his supervisor at Hospital District; (2) the August 2014 letter to Hospital District's compliance committee; (3) the July 2015 letter to Hospital District's board members, its compliance committee, and Harris County Judge and Commissioners; and (4) the September 2015 grievance letter to Hospital District. (*Id.* at 18–20, 25.) The Court agrees with Relator that these activities constitute protected activity under the FCA.

As to the June 2011 email, Relator pleaded he summarized a specific FCA lawsuit on above-market compensation for medical schools, discussed how to bring the Program into compliance at a subsequent meeting, and followed up a week later with a presentation to Hospital District's board members. (Dkt. No. 29 ¶¶ 179–180.) As to the August 2014 letter, Relator pleaded he formally informed Hospital District's compliance committee that Medical Schools were charging above-market value for services and "that *violations of the False Claims Act had occurred and were continuing to occur*." (*Id.* ¶ 188 (emphasis added).) As to the July 2015 letter, Relator pleaded he explained to Hospital District's board members, its compliance committee, and Harris County officials that Medical Schools were receiving above-market compensation under the Program and that he faced retaliation for attempting to address these issues. (*Id.* ¶¶ 196–197.) As to the September 2015 grievance letter, Relator pleaded he complained of retaliation against him for pointing out FCA violations in his August 2014 letter. (*Id.* ¶ 198.)

Relator's pleadings are not general or conclusory, as Hospital District argues. His complaints specifically connected Hospital District's involvement in the Program with potential FCA violations and "are sufficient to support a reasonable conclusion that [Hospital District] could

have feared being reported to the government for fraud or sued in a *qui tam* action by [Relator]." *United States ex rel. George v. Bos. Sci. Corp.*, 864 F. Supp. 2d 597, 606 (S.D. Tex. 2012) (quotations omitted).[7] Relator sufficiently pleaded protected activity under the FCA.

### B. Whether Hospital District Knew of the Protected Activity

The Court must next determine whether Relator alleged Hospital District knew of the protected activity described above. Such notice may be accomplished by any action that "put the employer on notice that litigation is a reasonable possibility," including internal complaints to supervisors. *Id.* at 608 (quotations omitted). However, if the protected activity is "consistent with the performance of the employee's [job] duties, such conduct does not provide the requisite notice to the employer." *Johnson*, 2014 WL 7239537, at *8; *see Robertson*, 32 F.3d at 952. In determining whether internal complaints provide sufficient notice, courts consider whether an employee characterized his complaints in terms of fraud on the federal government, went outside the normal chain of command to make the complaints, or otherwise objectively demonstrated the possibility of *qui tam* litigation. *See Robertson*, 32 F.3d at 952; *Miniex v. Houston Hous. Auth.*, 400 F. Supp. 3d 620, 642–43 (S.D. Tex. 2019). While an employee need not use certain magic words such as "illegal" or "fraud" in making internal complaints, he "must allege that [he] specifically told

---

[7] This case is clearly distinguishable from those cited by Hospital District in which employees raised only general concerns of misconduct. *See, e.g.*, *Johnson*, 2014 WL 7239537, at *9 (finding employee's email not to be protected activity because it did not contain anything suggesting the submission of false claims, or an investigation or inquiry into that subject); *United States ex rel. Ligai v. ETS-Lindgren Inc.*, No. 11-CV-2973, 2014 WL 4649885, at *16 (S.D. Tex. Sept. 16, 2014) (finding employee's complaints to employer about errors in performing government contract to be insufficient because he did not "specifically refer[] to fraudulent claims for payment for those services" or "put[] the employer on notice of potential FCA liability"), *aff'd sub nom. United States ex rel. Ligai v. ESCO Techs., Inc.*, 611 F. App'x 219 (5th Cir. 2015).

[employer] that [he] was concerned about fraud, one way or another." *Nichols v. Baylor Rsch. Inst.*, 418 F. Supp. 3d 143, 153 (N.D. Tex. 2019).

Hospital District argues that Relator's complaints did not sufficiently provide notice of a potential *qui tam* action because they were consistent with his self-described job duties of managing the Program's contract and approving invoices for Medical Schools. (Dkt. No. 123 at 19–21; Dkt. No. 141 at 10.) Hospital District also argues the fact that Relator alleged he submitted the August 2014 letter in conformity with compliance policy and used other staff to conduct investigations into above-market payments further demonstrates that his actions fell within normal job responsibilities. (Dkt. No. 123 at 19–21.) Finally, Hospital District argues Relator failed to plead that he went outside the normal chain of command to report fraud, since he failed to plead what his normal reporting structure was, and thus the Court cannot infer any of the protected activities were outside Relator's job duties. (*Id.* at 21; Dkt. No. 141 at 11.)

Relator contends he sufficiently pleaded notice by explaining the four protected activities described above, which he notes were outside the normal chain of command and thus were not consistent with his job duties. (Dkt. No. 132 at 21–22.) Relator also contends that his specific references to the FCA within these complaints provided ample notice to Hospital District of the potential for FCA litigation. (*Id.* at 21.) The Court agrees with Relator.

First, Relator's self-described job duties did not include engaging in the activities the Court has found to be protected. Relator stated his position as Associate Administrator for Provider Practices and Contracting involved managing the Program's contract and approving invoices for Medical Schools. (Dkt. No. 29 ¶ 120.) While Relator did allege he "checked the calculations and assessed the reasonableness" of certain charges, he also alleged he could not sufficiently review the invoices because Medical Schools did not provide back-up documentation. (*Id.* ¶ 123.) Relator

did not describe his job duties to include investigating the history, prevalence, or effect of above-market payments to Medical Schools or otherwise reviewing compliance with the FCA. While Relator did allege he used another employee to analyze compensation data (*id.* ¶¶ 165–166, 182–184), which could ultimately weigh against a finding that Relator's actions fell outside his job duties, it is equally plausible that the other employee was also acting outside his job duties by investigating these topics. *See Singletary v. Howard Univ.*, 939 F.3d 287, 302 (D.C. Cir. 2019) (noting—in the context of notice for an FCA retaliation claim—that a complaint "need not conclusively foreclose any alternative reading" and that all reasonable inferences must be drawn in an employee's favor).[8]

Second, each of the four protected activities here—the June 2011 email, the August 2014 letter, the July 2015 letter, and the September 2015 letter—involved Hospital District's board or compliance committee members. Relator alleged he followed up the June 2011 email with a presentation to Hospital District's board members. (Dkt. No. 29 ¶¶ 179–180.) Relator alleged he sent the August 2014 letter to Hospital District's compliance committee. (*Id.* ¶ 188.)[9] Relator

---

[8] This case is distinguishable from *United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729 (10th Cir. 2019), which Hospital District cites for the proposition that Relator's use of other staff "further confirms that he acted consistent with his job duties." (Dkt. No. 123 at 21.) The court in *Reed* did hold that help from an employee's staff "suggests that such activities fell within the ambit of [her] responsibilities . . . because one might reasonably infer that [her] staff would not be assisting her in off-book operations." *Reed*, 923 F.3d at 768. However, the employee in that case was a compliance officer and her supporting staff were engaged in both the investigation and reporting. *See id.* As alleged here, Relator was not a compliance officer and pointed to only one other Hospital District employee, from a different department, who helped him with investigation.

[9] Hospital District argues that Relator conceded this letter was sent in conformity with its compliance policy and thus it must have fallen within his job duties. (Dkt. No. 123 at 20; Dkt. No. 141 at 11.) Relator did state he "cit[ed] conformity to the Compliance Policy at [Hospital District]" in the letter. (Dkt. No. 29 ¶ 188.) However, it is unclear what the Compliance Policy stated, who it applied to or when it applied, and what the potential effect was of specifically referencing the FCA in the letter. Hospital District fails to shed light on these issues, and the Court cannot evaluate its argument at this time.

alleged he sent the July 2015 letter to Hospital District's board members, its compliance committee, and Harris County Judge and Commissioners, which he believed was a governing body of Hospital District. (*Id.* ¶ 196.) While Relator did not specify exactly who he filed the September 2015 grievance letter with, he did state that he complained of his supervisor and a compliance officer in the letter. (*Id.* ¶ 198.) It is reasonable to infer each instance of protected activity involved people outside the normal chain of command. *See Miniex*, 400 F. Supp. 3d at 642–43 (holding a reasonable jury could find employee's reports to board members were outside the normal chain of command and thus were not within normal job duties).

Third, Relator characterized his complaints in terms of fraud on the federal government. As described above, Relator alleged the June 2011 email and subsequent follow-up centered around a federal lawsuit involving the FCA and above-market compensation. (Dkt. No. 29 ¶¶ 179–180.) Relator also alleged the August 2014 letter specifically stated violations of the FCA were occurring due to above-market compensation. (*Id.* ¶ 188.) Finally, Relator alleged the July and September 2015 letters complained of retaliation against him for pointing out these FCA violations. (*Id.* ¶¶ 197–198.) It would be inappropriate at this stage of the proceedings to separate Relator's complaints of above-market compensation from the FCA or conclude Relator failed to inform Hospital District that *qui tam* litigation was possible. *See, e.g.*, *George*, 864 F. Supp. 2d at 609 (finding it plausible to infer that, by repeatedly asking questions about the legality of off-label marketing, employee raised concerns about fraudulent activity). Relator sufficiently pleaded that he put Hospital District on notice.

### C. Whether Relator Was Retaliated Against for Engaging in Protected Activity

Finally, the Court must determine whether Relator alleged he was retaliated against because of his protected activity. This element ultimately requires proof "the employer's retaliation

was motivated by the protected activity." *Id.* (quotations omitted). At the pleadings stage, an employee must allege facts that support a causal connection between the protected activity and retaliation. *See United States ex rel. Johnson v. Raytheon Co.*, 395 F. Supp. 3d 791, 799 (N.D. Tex. 2019); *see also Garcia v. Pro. Cont. Servs., Inc.*, 938 F.3d 236, 241–43 (5th Cir. 2019) (explaining that a prima facie case for retaliation requires only causal connection, rather than but-for causation). A causal connection can be inferred from a "combination of suspicious timing with other significant evidence of pretext." *George*, 864 F. Supp. 2d at 610 (quotations and alterations omitted); *see Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 44 (5th Cir. 1992) (holding temporal proximity was only "one of the elements in the entire calculation" of whether employee had shown causal connection between protected activity and retaliation).

Hospital District argues Relator failed to plead causation due to insufficient detail in his complaint and lack of temporal proximity between the alleged protected activity and retaliatory action. (Dkt. No. 123 at 21–22.) In particular, Hospital District argues Relator failed to plead who fired him or whether that person knew he engaged in protected activity, the dates of other alleged acts of retaliation, or that other alleged acts of retaliation negatively impacted his employment. (*Id.* at 22; Dkt. No. 141 at 11–12.) Relator provides a list of events explained in his complaint and argues he alleged both temporal proximity and that Hospital District made harassing statements in response to his protected activity. (Dkt. No. 132 at 23–26.) The Court agrees with Relator.

Relator alleged a back-and-forth pattern of protected complaints and adverse employment actions. Relator alerted Hospital District to the potential that above-market compensation violated the FCA in June 2011. (Dkt. No. 29 ¶ 179–180.) Relator wrote a letter formally informing Hospital District that above-market compensation to Medical Schools violated the FCA in August 2014. (*Id.* ¶ 188.) In response to this letter, Hospital District investigated Relator and issued a censure

letter that he alleged was inappropriately included in his personnel file. (*Id.* ¶ 189.) In February 2015, Hospital District participated in an audit of Relator's department and Mr. Masi threatened that Relator would suffer consequences if he challenged the findings. (*Id.* ¶¶ 190–191.) Relator nevertheless did so and was subsequently transferred to a different department. (*Id.* ¶ 191.) In July 2015, Relator wrote another letter reiterating his August 2014 letter and asserting retaliation. (*Id.* ¶¶ 196–197.) In September 2015, Relator filed a grievance against his supervisors and others for such retaliation. (*Id.* ¶ 198.) Relator was fired on February 11, 2016. (*Id.* ¶ 25.)

The Court acknowledges that some of these allegations lack specific dates or reveal gaps in time between events, particularly between Relator's grievance letter and his termination and between Relator's June 2011 and August 2014 letters. The Court also acknowledges that Relator did not state who fired him. However, Relator did allege that Mr. Masi issued the censure letter and inappropriately sent it to Mr. Norby, his boss. (*Id.* ¶ 189.) Relator also alleged he sent his letters to members of Hospital District's board and compliance committee. (*Id.* ¶¶ 180, 188, 196.) Given the various people involved and the extent of Relator's complaints, it is reasonable to infer when ruling on a motion to dismiss that knowledge of these events was pervasive at Hospital District, including by the person who fired him.[10]

When considered as a whole and in the context of explicit threats that Relator would "suffer consequences" if he complained, Relator alleged an overall pattern of conduct from which Hospital District's retaliatory motive can be reasonably inferred at this stage of the proceedings. *See George*, 864 F. Supp. 2d at 610–11 (finding detailed allegations of verbal reprimand and

---

[10] Hospital District's argument that Relator failed to allege its actions were negative is unavailing. Relator specifically connected his censure letter and transfer with "the reduction of his staff, the elimination of certain duties and responsibilities from his team, and the elimination of his ability to obtain merit increases." (*Id.* ¶ 197.)

harassment, in addition to close temporal proximity, sufficiently pleaded causation); *see also Kelley v. KIMC Invs. Inc.*, No. 10-CV-2384, 2012 WL 639283, at *6 (N.D. Tex. Feb. 28, 2012) (stating that, on a motion to dismiss, the court only tests the sufficiency of the pleadings and does not evaluate the parties' proof as it would on a summary judgment motion). Relator sufficiently pleaded he was retaliated against for engaging in protected activity.

IV. **CONCLUSION**

Based on the foregoing, the Court **RECOMMENDS** that Hospital District's Motion to Dismiss (Dkt. No. 123) be **DENIED**. Should the District Judge adopt this Memorandum and Recommendation, parties may conduct discovery related to Relator's retaliation claim.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers of the Undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas on August 4, 2021.

Sam S. Sheldon
United States Magistrate Judge